## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ROTH STAFFING COMPANIES, L.P.** | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | NO.: _____ |
| | : | |
| v. | : | |
| | : | |
| **WENDY STRUTHERS a/k/a WENDY** | : | |
| **WARD a/k/a WENDY WARD-** | : | |
| **STRUTHERS** | : | JULY 21, 2015 |
| | : | |
| Defendant. | : | |
| | : | |

### VERIFIED COMPLAINT

Plaintiff Roth Staffing Companies, L.P. ("Roth Staffing" or the "Company") files this Verified Complaint against Defendant Wendy Struthers a/k/a Wendy Ward a/k/a Wendy Ward-Struthers ("Defendant"). In support of this Verified Complaint, Roth Staffing states as follows:

### NATURE OF THE CASE

1.       This is an action for breach of contract and misappropriation of trade secrets. Roth Staffing seeks a preliminary and permanent injunction in addition to other relief.

2.       In May 2015, Defendant left her job as Practice Manager of Roth Staffing's Hartford, Connecticut office to become the Managing Director of SNI Companies, Inc. at its office in West Hartford, Connecticut. This violates Section 3.3 (Competition) of her Employment Agreement with Roth Staffing. In Section 3.3, Defendant agreed that for a period of one year after the end of her employment, she would not directly or indirectly compete with Roth Staffing within 25 miles of the Roth Staffing office where she had worked. SNI Companies competes with Roth Staffing in the staffing industry, and the West Hartford office

where Defendant works for SNI Companies is located approximately five miles from the Hartford office where she worked for Roth Staffing.

3.      Before she resigned from her position at Roth Staffing, Defendant used her Roth Staffing email account to send confidential information regarding Roth Staffing's business and customers to her personal email account.  Moreover, Roth Staffing has information that Defendant, in concert with and on behalf of SNI Companies, has continued to solicit business from customers she dealt with during her employment with Roth Staffing.  Defendant's conduct violates Sections 3.1 (Confidentiality), 3.2 (Employee's Duties on Termination), and 3.6 (Solicitation of Customers or Prospective Customers) in the Employment Agreement.

4.      Defendant's conduct also constitutes misappropriation and/or threatened misappropriation of trade secrets under the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 31-51 *et seq.*

## PARTIES

5.      Roth Staffing Companies, L.P. is a California limited partnership with its principal place of business in Orange, California.

6.      Defendant is a citizen and resident of the State of Connecticut residing, on information and belief, at 12 Lord Street, Rocky Hill, Connecticut 06067.

## JURISDICTION AND VENUE

7.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).  There is complete diversity of citizenship between the parties.  Defendant is a citizen of Connecticut, and none of Roth Staffing's general or limited partners resides or is based in Connecticut.

8.     The amount in controversy meets or exceeds $75,000, exclusive of interest and costs, because the value of Roth Staffing's trade secrets, other confidential information, and customer relationships exceeds $75,000.  Moreover, the gross profits from the customer accounts for which Defendant was responsible exceeded $75,000 during the last 12 months of her employment.

9.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## FACTS COMMON TO ALL COUNTS

### A.     The Business of Roth Staffing Companies, L.P.

10.     Roth Staffing is in the business of providing a variety of staffing, recruiting, and administrative services to companies in Connecticut and nationwide.  Some of the services that Roth Staffing provides to its clients include temporary staffing, temporary-to-hire, direct hire, executive search, independent contractor assistance, payrolling, contingent workforce management, and recruitment process outsourcing.  Through its full-service business lines, Roth Staffing provides customers with specialized staffing services including administrative and clerical, accounting and finance, technology and engineering, and legal.

11.     From its branch offices nationwide, Roth Staffing offers four business lines.  The Ultimate Staffing Services business line primarily recruits and places individual job candidates in the clerical, administrative, customer service, and manufacturing and production fields.  The Ledgent Financial and Accounting business line primarily recruits and places candidates in financial and accounting positions.  The Ledgent Technology and Engineering business line primarily recruits and places candidates in technology and engineering positions.  The Adams &

Martin Group business line primarily recruits and places attorneys and other professionals in the legal field.

12.     Roth Staffing develops and fosters goodwill with both its clients and its individual job candidates through a dedicated team of staffing services professionals. The team includes Practice Managers or Branch Managers who are responsible for overseeing the operations of a particular business line or branch office. The team also includes Business Solutions Managers, Account Executives, and Executive Recruiters who are responsible for building and maintaining strong personal relationships with clients and job candidates. The Roth Staffing employees who hold these positions are vital to maintaining the Company's goodwill with its clients and candidates. Many of Roth Staffing's customers and job candidates have long-standing relationships with the Company.

13.     The nature of the business conducted by Roth Staffing, including but not limited to the Company's provision of staffing services, involves frequent personal contact between the Company's staffing professionals and its customers and candidates, as well as the development of trust and confidence in Roth Staffing's services.

14.     Roth Staffing has invested considerable time, expense, and resources in its staffing professionals, including Defendant, to permit them to perform their work for Roth Staffing competently and credibly.

15.     In the course of conducting its business, Roth Staffing has also invested substantial time, expense, and resources to build its reputation, image and relationships with its customers, candidates and business contacts, and it has established a valuable and substantial reputation, trade and patronage.

4.

16.     Roth Staffing maintains trade secrets that are valuable, confidential, and proprietary to Roth Staffing, and that are not generally known in the public domain.

17.     Roth Staffing's Practice Managers and Branch Managers, including Defendant, gain detailed and intimate knowledge of Roth Staffing's trade secrets, customers, candidates, and the needs, preferences, likes, and dislikes of such customers and candidates.

18.     Roth Staffings's trade secrets, confidential information, and business relationships have significant economic value to the Company.  Roth Staffing has a legitimate business interest in keeping such information confidential, in maintaining its business goodwill and relationships, and not allowing its trade secrets and other confidential information to be disclosed to its competitors through any improper means.

19.     Roth Staffing's trade secrets, confidential information, employee relationships, customer relationships, and candidate relationships would be of significant economic value to the Company's competitors.

20.     To protect its business good will and customer relationships, confidential information and trade secrets, Roth Staffing requires its staffing professionals to sign written agreements that, among other things, contain certain limited restrictions on their business and employment activities after the end of their Employment Relationship with the Company.

**B.     Defendant's Employment With Roth Staffing**

21.     Roth Staffing employed Defendant at its Hartford office from November 2011 to May 2015.  From 2013 until her resignation in 2015, Defendant was the Practice Manager for the Ultimate Staffing business line in Roth Staffing's Hartford office.  Prior to that, Defendant was the Branch Manager of the Hartford office.  Defendant reported to Market Director Theresa DelVecchio, who is based on Roth Staffing's New Haven, Connecticut office.

22.     As Practice Manager, Defendant was responsible for overseeing all of the business operations for the Ultimate Staffing line in Roth Staffing's Hartford office. Her job duties included, without limitation, overseeing sales to customers, staffing placements, and the general wellbeing of the business. Additionally, Defendant was actively involved in Roth Staffing's efforts to sell staffing services to customers and prospective customers, and to place its candidates (known as "Ambassadors") in temporary and/or permanent positions with customers. Among other things, Defendant was actively involved in placing or attempting to place Ambassadors in clerical, administrative, or paralegal positions with law firms who were customers of Roth Staffing in the Hartford area.

23.     As a condition of Defendant's employment and continued employment, Defendant and Roth Staffing entered into an Employment Agreement effective July 19, 2013 ("Employment Agreement" or "Agreement"). See Exhibit A hereto. The Employment Agreement provides that it "and any cause of action arising out of the employment relationship shall be governed by the laws of the state in which Employee last worked for the Company, without regard to its conflicts of laws principles." Id., § 4.2.

24.     Defendant acknowledged in Section 3.1 of the Employment Agreement that she "will learn the Company's business affairs, finances, management, marketing programs, philosophy, customers, and methods of doing business." Employment Agreement, § 3.1. She further acknowledged that she "will have access to confidential information maintained at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers." Id. Additionally, Defendant agreed that "[t]his information is proprietary to the Company and, if used by competitors or other third parties, could cause substantial and irreparable damage to the Company." Id.

25.     In Section 3.1 of the Employment Agreement, entitled "Confidentiality," Defendant agreed that, both during and after her employment by Roth Staffing, she will not use, divulge, disclose or communicate any of the Company's confidential information.   More specifically, Defendant agreed as follows:

> Employee specifically agrees that he/she will not at any time, whether during or subsequent to the term of Employee's employment by the Company, in any fashion, form, or manner, unless specifically consented to in writing by the Company, either directly or indirectly, use or divulge, disclose or communicate to any person, firm, or corporation, in any manner whatsoever, any confidential information of any kind, nature, or description concerning any matters affecting or relating to the business of the Company . . . .

Id.

26.     In Section 3.1 of the Employment Agreement, Defendant agreed that Roth Staffing's confidential information includes, but is not limited to:

> customer lists, qualified prospective customer lists, employee lists, qualified prospective employee lists, sales and marketing information, customer account records, training and operations materials, personnel records, code books, pricing information, financial information, or any other confidential information of, about, or concerning the business of the Company, its manner of operation, or other confidential data of any kind, nature, or description.

Id.   Defendant and Roth Staffing stipulated that "the same are important, material, and confidential trade secrets and affect the successful conduct of the Company's business and its goodwill, and that any breach of any term of this paragraph is a material breach of this Agreement." Id.

27.     In Section 3.1 of the Employment Agreement, Defendant also agreed as follows:

> All equipment, notebooks, documents, memoranda, reports, computer programs, forms, files, books, correspondence, lists, other written and graphic records or other information storage devices, and the like, including innovations, ideas and developments, affecting or relating to the business of the Company, which Employee shall prepare, use, construct, observe, possess, or control shall be and remain the Company's sole property.

Id.

28.     In Section 3.2 of the Employment Agreement, entitled "Employee's Duties on Termination," Defendant agreed to return all Company property and not to maintain any copies of any Company confidential information or other Company property.  Section 3.2 provides:

> In the event of termination of employment with the Company, Employee agrees to deliver promptly to the Company all property of the Company (including, without limitation, confidential information, keys, access cards, computers/laptops, computer software and hardware, flash drives and other computer storage devices, equipment, notebooks, documents, memoranda, reports, files, samples, books, correspondence, lists, or other written or graphic records, and the like) relating to the Company's business, which are or have been in his/her possession or under his/her control.  Employee shall permanently delete copies of any Company confidential information and other Company property that Employee has on any personal electronic equipment or media and upon the Company's request will permit the Company to verify such deletions.

Id., § 3.2

29.     Further, in Section 3.3 of the Employment Agreement, entitled "Competition," Defendant agreed that for a period of one (1) year after the end of her employment, she will not compete with Roth Staffing within 25 miles of any Company location at which she worked or was assigned.  More specifically, Defendant agreed that she will not:

> directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with the Company . . . within 25 miles of any location at which Employee worked, was assigned, or over which the Employee had responsibility or supervisory authority.

Id., § 3.3.

30.     In Section 3.6 of the Employment Agreement, entitled "Solicitation of Customers or Prospective Customers," Defendant agreed that for a period of one (1) year after the end of her employment, she "will not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customers or potential customers of the

8.

Company with whom [she] did business within the last 18 months of employment for the purpose of promoting or selling any products or services competitive with those of the Company." Id., § 3.6.

31.     In Section 4.3 of the Employment Agreement, Defendant agreed "that the time provisions contained in Sections 3.3, 3.5 and 3.6 shall be tolled by the length of time during which [she] is in breach of said provisions." Id., § 4.3.

32.     In Section 4.4 of the Employment Agreement, Defendant agreed that if she or anyone acting for her "breaches or threatens to breach Sections 3.2 through 3.6" of the Employment Agreement, Roth Staffing "shall have the right to seek equitable/injunctive relief, including a temporary restraining order, a preliminary injunction, and final or permanent injunctions enjoining and restraining such breach or threatened breach," and that such remedies "shall be in addition to all other remedies available at law or in equity for such breaches, including damages, costs, and reasonable attorneys' fees." Id., § 4.4.

**C.     Defendant's Resignation from Roth Staffing and Employment by SNI Companies**

33.     On the morning of April 24, 2015, Defendant forwarded several emails from her Roth Staffing email account to her personal email account.  Those emails concerned a paralegal position that Defendant was involved in filling for a law firm client in West Hartford, Connecticut, and receptionist and administrative assistant positions that she was involved in filling for a law firm client in Simsbury, Connecticut.  Defendant also sent herself a copy of Roth Staffing's fee agreement with the Simsbury client, and emails pertaining to potential candidates for the law firm positions.

34.     On the morning of May 7, 2015, Defendant used her Roth Staffing email to send a copy of her Employment Agreement to her personal email account.  She also sent documents to

her personal email account regarding Roth Staffing's methods for selling staffing services to customers and potential customers.

35.     That afternoon, Defendant resigned by telephone to DelVecchio.  Defendant did not tell DelVecchio that she had accepted a position with a Roth Staffing competitor approximately five miles away from Roth Staffing's Hartford office.  Although Defendant offered to work a two-week "notice period" with Roth Staffing, after she hung up the phone she packed up all of her belongings and left the office without notifying DelVecchio.

36.     At some point after May 7, 2015, Defendant began working as the Managing Director of SNI Companies' West Hartford office, which is located at 433 South Main Street in West Hartford.  SNI Companies' West Hartford office is approximately five miles away from Roth Staffing's Hartford office, which is located at 280 Trumbull Street in Hartford.  SNI Companies is a large, national staffing company based in Des Moines, Iowa, which offers staffing, recruiting, and administrative services in competition with Roth Staffing throughout Connecticut and nationwide.

37.     Defendant, in concert with and on behalf of SNI Companies, continues to sell and provide staffing services in competition with Roth Staffing within a 25-mile radius of offices where she worked for Roth Staffing.

38.     Roth Staffing recently learned that Ward has solicited, induced or influenced, or sought to induce or influence, a Hartford-based customer of Roth Staffing for the purpose of promoting or selling staffing services in competition with Roth Staffing.  The Hartford-based customer is a law firm with whom Defendant did business during the last 18 months of her employment with Roth Staffing.

10.

39.     As a direct and proximate result of Defendant's actions including, but not limited to, her breach of the Agreement, Roth Staffing has been, and continues to be, damaged in an amount that is impossible to ascertain unless Defendant is enjoined from the aforementioned conduct. If Defendant is not so enjoined, Roth Staffing will continue to be irreparably harmed by, among other things, loss of goodwill, loss of customers, and loss of business information, and will continue to suffer present and future economic loss.

40.     Roth Staffing has already suffered and will continue to suffer irreparable injury and harm to its business, and monetary damages alone are an inadequate redress for such continuing injury.

**COUNT I**

**BREACH OF CONTRACT**

1-40.   Roth Staffing repeats and realleges the allegations in paragraphs 1 through 40 as if fully set forth herein.

41.     Defendant's Employment Agreement is a valid contract supported by adequate consideration, and Roth Staffing has performed under that Agreement.

42.     Defendant breached Section 3.3 of the Employment Agreement by working with a competitor of Roth Staffing, within a 25-mile radius of the office(s) where she worked for Roth Staffing, within a one-year period after the end of her employment with Roth Staffing.

43.     Defendant breached Section 3.6 of the Employment Agreement by directly or indirectly or by action in concert with others, soliciting, inducing or influencing (or seeking to induce or influence) at least one customer or potential customer of Roth Staffing with whom she did business within the last 18 months of her employment for the purpose of promoting or selling any products or services competitive with those of Roth Staffing.

11.

44.     Defendant breached, and inevitably will continue to breach, Section 3.1 of the Employment Agreement by using, divulging, disclosing, or communicating Roth Staffing's confidential information outside of her employment by Roth Staffing and without Roth Staffing's express written consent.

45.     Defendant breached Section 3.2 of the Employment Agreement by failing to return all Company property in her possession and by maintaining copies of Company confidential information and/or other Company property after her resignation from Roth Staffing.

46.     Defendant continues to violate her contractual obligations, and will continue to violate these obligations in the future unless she is enjoined from doing so.

47.     As a consequence of the foregoing, Roth Staffing has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present and future economic harm which is unascertainable at the present time.

## COUNT II

### VIOLATION OF CUTSA

1-40.     Roth Staffing repeats and realleges the allegations in paragraphs 1 through 40 as if fully set forth herein.

41.     Roth Staffing has maintained and developed highly valuable trade secrets as defined in the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-51 et seq. ("CUTSA"), and other proprietary information which are safeguarded as confidential and secret and protected from direct or indirect disclosure.

42.     Roth Staffing's trade secrets and other proprietary information are extremely valuable and critical to the operation of Roth Staffing's business.

43.     Under CUTSA, actual or threatened misappropriation of trade secrets may be enjoined and damages, punitive damages, and attorney fees may be awarded.

44.     Defendant's conduct constitutes the actual or threatened misappropriation, misuse, and/or inevitable disclosure or reliance upon Roth Staffing's trade secrets and other confidential and proprietary information.

45.     Defendant had access to Roth Staffing's trade secrets and other confidential and proprietary information during her employment by Roth Staffing.

46.     Defendant's actions expose Roth Staffing to the disclosure, threatened disclosure, and/or inevitable disclosure of Roth Staffing's valuable trade secrets and other confidential and proprietary information.

47.     Defendant has failed to protect or otherwise not use or disclose Roth Staffing's trade secrets and other confidential and proprietary information.

48.     Defendant's actions as herein described constitute unlawful misappropriation by improper means of Roth Staffing's trade secrets in violation of CUTSA.

49.     Unless Defendant is enjoined from disclosing and utilizing Roth Staffing's trade secrets, Roth Staffing will continue to be immediately and irreparably harmed since its competitor has received, will continue to receive, and have the use of trade secrets and other confidential information developed and maintained by Roth Staffing and that is not generally known to the public; and Defendant can use such trade secrets and confidential information to her and her employer's economic advantage and to Roth Staffing's detriment in competing unfairly with Roth Staffing.

50.     Roth Staffing has taken reasonable precautions to preserve the secrecy of the trade secrets known to Defendant.   Those precautions include, but are not limited to, requiring Defendant and other employees to sign agreements containing confidentiality provisions and provisions requiring the return of confidential information and other Company property.

51.     As a result of the actual and/or threatened misappropriation of Roth Staffing's trade secrets by Defendant, Roth Staffing has suffered and will continue to suffer damages, as well as immediate and irreparable harm.  Roth Staffing has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Roth Staffing prays for the following relief:

A.     An Order of preliminary and permanent injunctive relief against Defendant and all other persons or entities who are in active concert or participation with her, as follows:

1.     Until the latter of May 7, 2016 or one (1) year from the last date that Defendant is in violation of Section 3.3 of the Employment Agreement, Defendant shall not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with Roth Staffing (other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange) within 25 miles of any location of Roth Staffing at which Defendant worked, was assigned, or over which Defendant had responsibility or supervisory authority, nor shall she be so employed by any of other persons who are in active concert or participate with her;

2.     Until the latter of May 7, 2016 or one (1) year from the last date that Defendant is in violation of Section 3.6 of the Employment Agreement, Defendant shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customers or potential customers of Roth Staffing with whom she did business within the last 18 months of her employment with Roth Staffing, for the purpose of promoting or selling any products or services competitive with those of Roth Staffing;

15.

3.     Defendant, and all other persons or entities who are in active concert or participation with her, shall not, directly or indirectly, use or divulge, disclose or communicate to any person, firm, or corporation, in any manner whatsoever, any confidential information of Roth Staffing in accordance with Section 3.1 of the Employment Agreement;

4.     Within seven (7) days of an Order of Preliminary Injunction, Defendant shall deliver to Roth Staffing any and all confidential information and other property of Roth Staffing that is in her custody, possession, or control or the custody, possession, or control of any persons or entities who are in active concert or participation with her, in accordance with Sections 3.1 and 3.2 of the Employment Agreement; and

5.     Defendant, and all other persons or entities who are in active concert or participation with her, shall not engage in any misappropriation of Roth Staffing's trade secrets, as those terms are defined in Conn. Gen. Stat. § 35-51;

B.     Damages, including but not limited to lost profits, in an amount to be proven at trial;

C.     Punitive damages;

D.     Attorneys' fees;

E.     Applicable pre-judgment and post-judgment interest;

F.     Costs; and

G.     Such other and further relief, legal and equitable, that this Court deems just and proper.

Dated at New Haven, Connecticut this 21st day of July, 2015.

Respectfully submitted,

PLAINTIFF, ROTH STAFFING
COMPANIES, L.P.


/s/ Stephen P. Rosenberg
Stephen P. Rosenberg (ct26601)
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
sprosenberg@littler.com

17.

## VERIFICATION

I, Theresa DelVecchio, Market Director for Roth Staffing Companies, L.P. ("Roth Staffing"), am the authorized representative of Roth Staffing for the purposes of verifying the foregoing Complaint. I have personal knowledge of the matters set forth in the Complaint or the information contained therein has been collected and made available to me by counsel and employees of Roth Staffing. I affirm that the factual information and statements made therein are true and correct to the best of my knowledge and belief.

_Theresa DelVecchio_
Theresa DelVecchio

STATE OF CONNECTICUT      )
                                   ) ss.: New Haven, Connecticut
COUNTY OF NEW HAVEN    )

Personally appeared, Theresa DelVecchio before me and subscribed and swore to the foregoing on this _17th_ day of July, 2015.

_Maureen K. Deilhachio_
Notary Public / ~~Commissioner of the Superior Court~~
My Commission Expires: _2/28/2018_

18.

# Exhibit A

# EMPLOYMENT AGREEMENT

### (rev. 5/13)

This Employment Agreement is made and entered into by and between Roth Staffing Companies, L.P. a California limited partnership (the "Company") and Wendy Ward (the "Employee"), effective July 19, 2013.

## AGREEMENT

In consideration of the mutual promises set forth in this Agreement, including, but not limited to, the Company's employment, continued employment, promotion or reassignment of the Employee, new or additional compensation to the Employee, specialized training and access to new and different confidential information, benefits provided under the Company's "From the Heart" Program, any one or more of which the Employee hereby acknowledges to be good and sufficient consideration, the receipt and sufficiency of which the Employee hereby acknowledges, the parties agree as follows:

## ARTICLE I.
## EMPLOYMENT

### 1.1    Employment.

The Company hereby agrees to employ the Employee and the Employee hereby agrees to serve the Company in the capacity of Practice Manager, at the Ultimate Staffing, Hartford, Connecticut, branch location. Such employment shall be based upon the terms and conditions set forth in this Agreement.

### 1.2    Duties and Responsibilities.

During the term of employment, the Employee shall devote full time, efforts, abilities, and energies to the Company's business. The Employee shall use best efforts, skill, and abilities to promote the general welfare and interests of the Company, and any related enterprises of the Company. The Employee shall loyally, conscientiously, and professionally do and perform all such duties and responsibilities as shall be reasonably assigned by the Company and the Employee's superiors from time to time. Any job description that describes the duties and responsibilities of the Employee may be revised from time to time. The Employee shall at all times during the period of employment strictly adhere to and obey all rules, policies, and guidelines established by the Company for its employees, as such rules, policies, and guidelines are now in effect or as they may be modified by the Company, in its sole discretion, from time to time. The Employee shall not, directly or indirectly, render any services of a business, commercial or professional nature to any other person, firm or organization, whether for compensation or otherwise, while employed by the Company, unless the prior written consent of the Company has first been obtained. The Employee shall not use any confidential information belonging to a former employer during the course of employment with the Company.

### 1.3    At-Will Agreement.

The Employee's employment with the Company is for an unspecified term and is at-will. Accordingly, either the Employee or the Company can terminate the employment relationship at

will, at any time, with or without cause or prior notice. This at-will aspect of the Employee's employment, which includes the right of the Company to demote, transfer or discipline the Employee with or without cause or prior notice, cannot be changed, waived or modified, except by an individualized written employment contract to the contrary, signed by both the Employee and the Chief Executive Officer of the Company.

1.4    **Location.**
During the term of employment, the Employee shall perform his/her duties at any location owned and/or operated by the Company or any related company or at such other place or places as may be designated by the Company from time to time.

## ARTICLE II.
## COMPENSATION

2.1    **Salary.**
The Company shall pay Employee, and Employee shall accept from the Company in full payment for Employee's services hereunder, **$2,576.92 per bi-weekly pay period** (or in accordance with the Company's then-current payroll policy), which equates to **$67,000.00 on an annualized basis.** Adjustments to Employee's compensation shall be made in a manner that is consistent with the Company's policies and procedures.

2.2    **Employee Benefits.**
Employee is eligible to participate in Company employee benefit programs under the terms of the then-existing Company policies commensurate with other Company employees at the same level as the Employee. These employee benefit programs currently include sick leave, vacation, medical, dental, vision, short-term and long-term disability, life insurance, and 401(k) plan.

Currently, Employee is eligible to earn vacation, which increases with the length of employment as shown in the following schedule.[1] Vacation earnings are accrued daily for Regular Full-Time Employees.

| Employment Period | Vacation Hours Per Year | Maximum Accrual |
|---|---|---|
| Each pay period from date of hire through 24 months | **96 hrs** **(12 days)** | **105.6 hrs** **(13.2 days)** |
| 25 months through 60 months | **112 hrs** **(14 days)** | **123.2 hrs** **(15.4 days)** |
| 61 months through 108 months | **136 hrs** **(17 days)** | **149.6 hrs** **(18.7 days)** |

---

[1] This schedule supersedes any accrual schedule contained in the Company's Employee Handbook as of Employee's start date, but may be modified from time to time.

2

| 109 months + | 176 hrs<br>(22 days) | 193.6 hrs<br>(24.2 days) |
| --- | --- | --- |

In addition, eligible regular full-time employees will accrue sick leave benefits at the rate of 1.55 hours per bi-weekly pay period up to a maximum of 161.2 hours (20 days).[2]

### 2.3   From the Heart Program.

Employee shall also be eligible for certain benefits under the Company's From the Heart Program, including, but not limited to, the RAD Days Program applicable to Employee's position, gym membership contributions, and the Community Volunteer Program.   Company benefits and programs may be modified from time to time.

### 2.4   Bonus.

In addition to the salary specified in Section 2.1, the Employee shall be eligible to receive bonuses based on the terms and conditions of the **Branch Manager B/Practice Manager Bonus Program**, which may be amended or modified from time to time.   Employee must complete the entire designated bonus period to earn the bonus.   Please refer to the **Branch Manager B/Practice Manager Bonus Program and the Bonuses and Commissions Terms and Conditions** for the entire bonus criteria.

### 2.5   Auto Reimbursement.

Employee shall receive $.565 per mile (based on IRS guidelines and Company policy, subject to change), paid monthly as auto reimbursement for the use of a personal automobile on Company business.

### 2.6   Business Expenses.

Employee shall be reimbursed monthly for all Company-related business expenses that are pre-approved by his/her manager.

### 2.7   Integration Clause.

No one in the Company, other than its CEO, has the right to alter the at-will nature of the employment relationship or to change the provisions in Section 1.2. regarding the employment relationship.   The CEO may only alter the nature of the employment relationship if he does so in a written agreement signed both by the CEO and the Employee.   Furthermore, there are not now and may not in the future be any implied or oral agreements, covenants, or obligations that in any way affect or impair the ability of the Employee or the Company to terminate the employment relationship at will, at any time.   Specifically, the Company's policies and procedures and/or Employee Handbook do not constitute a guarantee of continued employment between the Employee and the Company.

---

[2] This accrual rate supersedes any accrual rate contained in the Company's Employee Handbook as of Employee's start date, but may be modified from time to time.

## ARTICLE III.
## CONFIDENTIALITY AND RESTRICTIVE COVENANTS

3.1 **Confidentiality**.

Employee will learn Company's business affairs, finances, management, marketing programs, philosophy, customers, and methods of doing business. Employee will have access to confidential information maintained at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers. This information is proprietary to the Company and, if used by competitors or other third parties, could cause substantial and irreparable damage to the Company.

Employee specifically agrees that he/she will not at any time, whether during or subsequent to the term of Employee's employment by the Company, in any fashion, form, or manner, unless specifically consented to in writing by the Company, either directly or indirectly, use or divulge, disclose or communicate to any person, firm, or corporation, in any manner whatsoever, any confidential information of any kind, nature, or description concerning any matters affecting or relating to the business of the Company, including, without limiting the generality of the foregoing, customer lists, qualified prospective customer lists, employee lists, qualified prospective employee lists, sales and marketing information, customer account records, training and operations materials, personnel records, code books, pricing information, financial information, or any other confidential information of, about, or concerning the business of the Company, its manner of operation, or other confidential data of any kind, nature, or description. The parties hereto stipulate that as between them, the same are important, material, and confidential trade secrets and affect the successful conduct of the Company's business and its goodwill, and that any breach of any term of this paragraph is a material breach of this Agreement. All equipment, notebooks, documents, memoranda, reports, computer programs, forms, files, books, correspondence, lists, other written and graphic records or other information storage devices, and the like, including innovations, ideas and developments, affecting or relating to the business of the Company, which Employee shall prepare, use, construct, observe, possess, or control shall be and remain the Company's sole property.

3.2 **Employee's Duties on Termination**.

In the event of termination of employment with the Company, Employee agrees to deliver promptly to the Company all property of the Company (including, without limitation, confidential information, keys, access cards, computers/laptops, computer software and hardware, flash drives and other computer storage devices, equipment, notebooks, documents, memoranda, reports, files, samples, books, correspondence, lists, or other written or graphic records, and the like) relating to the Company's business, which are or have been in his/her possession or under his/her control. Employee shall permanently delete copies of any Company confidential information and other Company property that Employee has on any personal electronic equipment or media and upon the Company's request will permit the Company to verify such deletions.

4

3.3 **Competition.**

During the term of employment, Employee agrees that he/she will not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with the Company, other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange.  For a period of one year after Employee's employment terminates (regardless of the reason for termination or whether such termination was by the Company or Employee), Employee agrees that he/she shall not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with the Company (other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange) within 25 miles of any location at which Employee worked, was assigned, or over which the Employee had responsibility or supervisory authority.

3.4 **Organization of Competitive Business.**

During the term of employment, Employee agrees that he/she will not undertake planning for or organization of any business activity competitive with the Company's business or combine or conspire with other employees or representatives of the Company's business for the purpose of organizing any such competitive business activity.

3.5 **Solicitation of Employees.**

During the term of this Agreement and for a period of one year after the employment relationship between the parties terminates (regardless of the reason for termination or whether such termination was by the Company or Employee), Employee agrees that he/she will not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any person who is engaged (as a temporary or regular employee, agent, independent contractor, or otherwise) by the Company to terminate his or her employment or engagement.  This section 3.5 shall only apply to persons Employee learned of or became familiar with as a result of the employment relationship.

3.6 **Solicitation of Customers or Prospective Customers.**

During the term of this Agreement and for one year after the employment relationship between the parties terminates (regardless of the reason for termination or whether such termination was by the Company or Employee), Employee agrees that he/she will not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customers or potential customers of the Company with whom he/she did business within the last 18 months of employment for the purpose of promoting or selling any products or services competitive with those of the Company.

3.7 **Intellectual Property.**

Employee agrees that all inventions (whether or not protected under patent laws), works of authorship, information fixed in any tangible medium (whether or not protected under

copyright laws), artwork, graphics, ideas, algorithms, market research, strategies, incoming and outgoing electronic communications, source code and documentation, software programs, existing and prospective clients' information, existing and prospective employees'/candidates' information, moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas (whether or not protected under trade secret laws), and all other subject matter protected under patent, copyright, moral right, mask work, trademark, trade secret, or other laws, including without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, artwork, software, programming, applets, scripts, and designs written, developed, originated, fixed or reduced to practice by Employee (collectively, "Works") shall be the sole and exclusive property of the Company. Works shall include all information relating to clients and candidates collected by Employee in any manner by any means through any media during Employee's employment. Employee hereby assigns, transfers and conveys to the Company, exclusively and perpetually, all worldwide right, title, and interest in any and all services and Works and any and all resulting copyrights, patents and trade secrets to the Company (collectively, "Proprietary Rights"). Employee agrees to execute such documents and do such acts as may be necessary to perfect, register and enforce the Company's Proprietary Rights at no charge to the Company.

## ARTICLE IV.
## MISCELLANEOUS

4.1    **Arbitration of Controversies.**
Employee expressly acknowledges and agrees that, to the fullest extent allowed by law, any controversy, claim or dispute between Employee and the Company (and/or any of its affiliates, divisions, owners, shareholders, directors, partners, members, officers, employees, volunteers or agents) relating to or arising out of Employee's employment or the cessation of that employment will be submitted to final and binding arbitration before a neutral arbitrator in the county in which Employee work(ed) for determination pursuant to the Federal Arbitration Act, and administered by JAMS or the American Arbitration Association in accordance with JAMS' Employment Arbitration Rules and Procedures (which can be accessed at www.jamsadr.com/rules-employment-arbitration) or with the American Arbitration Association's National Rules for the Resolution of Employment Disputes (which can be accessed at www.adr.org/sp.asp?id=32904), respectively, as the exclusive remedy for such controversy, claim or dispute.

In any such arbitration, the parties may conduct discovery to the same extent as would be permitted in a court of law. The arbitrator shall issue a written decision stating the essential findings and conclusions on which the award is based, and shall have full authority to award all remedies that would be available in court. The Company shall pay all arbitrator's fees and any arbitration administrative expenses, to the extent required by law. Any judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

This bi-lateral arbitration agreement covers, but is not limited to, claims of unpaid wages, breach of contract, torts, violation of public policy, discrimination, harassment, or any other employment-related claims under laws including but not limited to, Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act, the Age Discrimination in Employment Act,

the Equal Pay Act, the Fair Labor Standards Act, the Family Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Labor Code, and any other statutes, laws, or regulations relating to an employee's relationship with his/her employer, regardless of whether such dispute is initiated by the employee or the Company. HOWEVER, EMPLOYEE SHALL HAVE NO RIGHT OR AUTHORITY TO HAVE ANY DISPUTE BROUGHT, HEARD, OR ARBITRATED AS A CLASS ACTION, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANY PERSON NOR SHALL EMPLOYEE HAVE ANY RIGHT OR AUTHORITY TO JOIN ANY SUCH ACTION. FURTHERMORE, THE ARBITRATOR SHALL HAVE NO RIGHT TO CERTIFY, CONSOLIDATE, OR COLLECTIVELY ARBITRATE MULTIPLE INDEPENDENT CLAIMS. This Agreement also covers any and all claims that the Company may have against Employee, including (but not limited to) claims for misappropriation of Company property, disclosure of proprietary information or trade secrets, interference with contract, trade libel, gross negligence, or any other claim for alleged wrongful conduct or breach of the duty of loyalty. This arbitration requirement does not apply to claims for workers' compensation benefits, unemployment claims, benefit claims that culminate in another arbitration process, claims arising under the National Labor Relations Act, claims arising under ERISA (29 U.S.C. §§ 1001 et. seq.), any other claims where mandatory arbitration is prohibited by law, or charges filed with federal or state administrative agencies alleging violations of federal and state laws prohibiting discrimination, harassment, and retaliation; however, Employee agrees to waive Employee's right to recover monetary damage in connection with any such charge, complaint, or lawsuit that may be filed by such administrative agency and agrees that relief obtained through binding arbitration will be Employee's exclusive individual remedy. In addition, nothing in this Agreement shall prevent the Company or Employee from applying to courts for provisional remedies .  BY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH EMPLOYEE AND THE COMPANY GIVE UP ALL RIGHTS TO A TRIAL BY JURY. This bi-lateral arbitration agreement is to be construed as broadly as is permissible under applicable law.

  4.2   **Governing Law and Venue.**
       This Agreement and any cause of action arising out of the employment relationship shall be governed by the laws of the state in which Employee last worked for the Company, without regard to its conflicts of laws principles. Venue for any dispute involving the interpretation of this Agreement or for any cause of action arising out of the employment relationship shall be in the county in which Employee last worked for the Company. Nothing in this provision shall be interpreted to be inconsistent with the parties' agreement to arbitrate set forth in paragraph 4.1 above.

  4.3   **Tolling and Severability.**
       Employee agrees that the time provisions contained in Sections 3.3, 3.5 and 3.6 shall be tolled by the length of time during the period of which Employee is in breach of said provisions. Should any portion of this Agreement be determined by any arbitrator or court of competent jurisdiction to be invalid, the remainder of the Agreement will remain in full force and given an effect as near as possible to the original intent of the parties. The restrictions set forth in Article III are considered by the parties to this Agreement to be reasonable for the purpose of protecting the Company's Proprietary Information. However, if any such restriction is found by any

arbitrator or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

4.4    **Injunction.**
If Employee or anyone acting for Employee breaches or threatens to breach Sections 3.2 through 3.6 of this Agreement, the Company shall have the right to seek equitable/injunctive relief, including a temporary restraining order, a preliminary injunction, and final or permanent injunctions enjoining and restraining such breach or threatened breach. Such remedies shall be in addition to all other remedies available at law or in equity for such breaches, including damages, costs, and reasonable attorneys' fees.

4.5    **Waiver.**
Either party's failure to enforce any section or sections of this Agreement shall not in any way be construed as a waiver of any such provision or provisions, or prevent that party thereafter from enforcing each and every other provision of this Agreement.

4.6    **Notices.**
Any notice to be given to the Company under the terms of this Agreement shall be addressed to the Company at the address of its principal place of business (333 City Boulevard West, Suite 100, Orange, CA 92868), and any notice to be given to Employee shall be addressed to the Employee's home address last shown on the records of the Company, or at such other address as either party may hereafter designate in writing to the other. Any such notice shall be in writing and shall be deemed to have been duly given upon personal delivery, on the second calendar day after it has been enclosed in a properly sealed and addressed envelope and sent via nationally recognized overnight courier, or on the third calendar day after it has been enclosed in a properly sealed and addressed envelope, certified, and deposited (postage and certification fee prepaid) in a post office or branch post office regularly maintained by the United States Government.

4.7    **Entire Agreement.**
This Agreement constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes any and all other agreements, communications, understandings, promises, stipulations, arrangements, whether any of the same are either oral or in writing, or express or implied, between the parties hereto with respect to the subject matter hereof, including, but not limited to, any implied-in-law or implied-in-fact covenants or duties relating to employment or the termination of employment. No change to or modification of this Agreement shall be valid or binding unless the same shall be in writing and signed by both the Employee and the CEO of the Company.

4.8    **Disclosure of Agreement.**
The Company may disclose any portion of this Agreement to any person or organization, including actual and potential employers of Employee, without incurring liability to the Employee.

8

4.9     **No Set-Off By Employee.**

No demand, action, or cause of action that Employee may have against Company shall constitute a defense to the Company's enforcement of any rights under the Agreement.

IN WITNESS WHEREOF, the parties hereto acknowledge that they have read this Agreement, fully understand it, and have freely and voluntarily entered into it.

**ROTH STAFFING COMPANIES, L.P.**

By: _____

**Jennifer Simonson**
**General Counsel, Senior Vice President**

Dated:  July 16, 2013

By: _____

**Wendy Ward**

Dated: _7/19/13_____

I have been advised to seek the advice of an attorney before signing this Agreement, and have either done so, or decline to do so.

By: _____

**Wendy Ward**

Dated: _____