UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROTH STAFFING COMPANIES, L.P. | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | NO.: _____ |
| | : | |
| v. | : | |
| | : | |
| WENDY STRUTHERS a/k/a WENDY | : | |
| WARD a/k/a WENDY WARD- | : | |
| STRUTHERS | : | JULY 21, 2015 |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Roth Staffing Companies, L.P. ("Roth Staffing" or the "Company") submits this Memorandum of Law in support of its Motion for Preliminary Injunction against Defendant Wendy Struthers a/k/a Wendy Ward a/k/a Wendy Ward-Struthers.

## I.    INTRODUCTION

In May 2015, defendant left her job as practice manager for Roth Staffing's "Ultimate Staffing" line of business in its Hartford office to become the managing director of a competitor's West Hartford office.    Two weeks before she resigned, defendant used her Company email to forward confidential information regarding Roth Staffing customers and job candidates to her personal email account.    On the day she resigned, defendant sent herself even more confidential information.    Since that time, Roth Staffing has learned that defendant, directly or indirectly and in concert with her new employer, has solicited business from at least one of the customers she had dealt with on behalf of Roth Staffing.

Defendant's conduct violates her Employment Agreement with Roth Staffing, attached as *Exhibit A* hereto ("Agreement" or "Employment Agreement").    Her employment with a

competitor approximately five miles from Roth Staffing's Hartford office violates Section 3.3 of the Agreement, which prohibits her for a period of one year from competing within 25 miles of the Roth Staffing office(s) where she worked or was assigned, or over which she had responsibility or supervisory authority. Defendant's solicitation of at least one Roth Staffing customer violates Section 3.6 of the Agreement, which prohibits her for a period of one year from soliciting, inducing, or influencing – or attempting to induce or influence – any customer or prospective customer with whom she did business during the last 18 months of her employment. Moreover, defendant's conduct violates Sections 3.1 and 3.2 of the Agreement with regard to Roth Staffing's confidential information and property, and is also an actual or threatened misappropriation of trade secrets under the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen. Stat. § 31-51 *et seq.*

Defendant's conduct is all the more egregious because she was well aware of the restrictive covenants in her Agreement. In August 2013, defendant testified on Roth Staffing's behalf at a preliminary injunction hearing to enforce similar restrictive covenants in an agreement signed by one of her former subordinates. *See Roth Staffing Companies, L.P. v. Brown*, No. 3:13-CV-216 (JBA), 2013 U.S. Dist. LEXIS 189650, at *2-3 (D. Conn. Oct. 16, 2013) (Margolis, J.), *approved and adopted*, 2015 U.S. Dist. LEXIS 61823 (D. Conn. May 12, 2015) (Arterton, J.) ("Roth Staffing" or "Brown," attached as *Exhibit B* hereto).[1] On May 7, 2015, defendant emailed a copy of her Agreement to herself before resigning from the Company. A preliminary injunction is necessary to stem defendant's violations of the Agreement and the CUTSA and prevent further irreparable harm to Roth Staffing.

---

[1]  At the time of her testimony in the *Brown* case, defendant was known as Wendy Ward.

## II. STATEMENT OF FACTS

### A. The Business of Roth Staffing Companies, L.P.

Roth Staffing is in the business of providing a variety of staffing, recruiting, and administrative services to companies in Connecticut and nationwide. Verified Complaint ("Ver. Compl."), ¶ 10. Some of the services that Roth Staffing provides to its clients include temporary staffing, temporary-to-hire, direct hire, executive search, independent contractor assistance, payrolling, contingent workforce management, and recruitment process outsourcing. Through its full-service business lines, Roth Staffing provides customers with specialized staffing services including administrative and clerical, accounting and finance, technology and engineering, and legal. *Id.*

From its branch offices nationwide, Roth Staffing offers four business lines. The Ultimate Staffing Services business line primarily recruits and places individual job candidates in the clerical, administrative, customer service, and manufacturing and production fields. The Ledgent Financial and Accounting business line primarily recruits and places candidates in financial and accounting positions. The Ledgent Technology and Engineering business line primarily recruits and places candidates in technology and engineering positions. The Adams & Martin Group business line primarily recruits and places attorneys and other professionals in the legal field. *Id.*, ¶ 11.

Roth Staffing develops and fosters goodwill with both its clients and its individual job candidates through a dedicated team of staffing services professionals. The team includes Practice Managers or Branch Managers who are responsible for overseeing the operations of a particular business line or branch office. The team also includes Business Solutions Managers, Account Executives, and Executive Recruiters who are responsible for building and maintaining

strong personal relationships with clients and job candidates. The Roth Staffing employees who hold these positions are vital to maintaining the Company's goodwill with its clients and candidates. Many of Roth Staffing's customers and job candidates have long-standing relationships with the Company. *Id.*, ¶ 12.

The nature of the business conducted by Roth Staffing, including but not limited to the Company's provision of staffing services, involves frequent personal contact between the Company's staffing professionals and its customers and candidates, as well as the development of trust and confidence in Roth Staffing's services. *Id.*, ¶ 13. Roth Staffing has invested considerable time, expense, and resources in its staffing professionals, including Defendant, to permit them to perform their work for Roth Staffing competently and credibly. *Id.*, ¶ 14.

In the course of conducting its business, Roth Staffing has also invested substantial time, expense, and resources to build its reputation, image and relationships with its customers, candidates and business contacts, and it has established a valuable and substantial reputation, trade and patronage. *Id.*, ¶ 15. Roth Staffing maintains trade secrets that are valuable, confidential, and proprietary to Roth Staffing, and that are not generally known in the public domain. *Id.*, ¶ 16. Roth Staffing's Practice Managers and Branch Managers, including defendant, gain detailed and intimate knowledge of Roth Staffing's trade secrets, customers, candidates, and the needs, preferences, likes, and dislikes of such customers and candidates. *Id.*, ¶ 17.

Roth Staffing's trade secrets, confidential information, and business relationships have significant economic value to the Company. Roth Staffing has a legitimate business interest in keeping such information confidential, in maintaining its business goodwill and relationships, and not allowing its trade secrets and other confidential information to be disclosed to its

competitors through any improper means. *Id.*, ¶ 18. Roth Staffing's trade secrets, confidential information, employee relationships, customer relationships, and candidate relationships would be of significant economic value to the Company's competitors. *Id.*, ¶ 19. To protect its business good will and customer relationships, confidential information and trade secrets, Roth Staffing requires its staffing professionals to sign written agreements that, among other things, contain certain limited restrictions on their business and employment activities after the end of their Employment Relationship with the Company. *Id.*, ¶ 20.

### B. Defendant's Employment With Roth Staffing

Roth Staffing employed Defendant at its Hartford office from November 2011 to May 2015. From 2013 until her resignation in 2015, Defendant was the Practice Manager for the Ultimate Staffing business line in Roth Staffing's Hartford office. Prior to that, Defendant was the Branch Manager of the Hartford office. Defendant reported to Market Director Theresa DelVecchio, who is based on Roth Staffing's New Haven, Connecticut office. *Id.*, ¶ 21.

As Practice Manager, Defendant was responsible for overseeing all of the business operations for the Ultimate Staffing line in Roth Staffing's Hartford office. Her job duties included, without limitation, overseeing sales to customers, staffing placements, and the general wellbeing of the business. Additionally, Defendant was actively involved in Roth Staffing's efforts to sell its services to customers and prospective customers, and to place its candidates (known as "Ambassadors") in temporary and/or permanent positions with customers. Among other things, Defendant was actively involved in placing or attempting to place Ambassadors in clerical, administrative, or paralegal positions with law firms who were customers of Roth Staffing in the Hartford area. *Id.*, ¶ 22.

As a condition of Defendant's employment and continued employment, Defendant and Roth Staffing entered into an Employment Agreement effective July 19, 2013. *Id.*, ¶ 23; Employment Agreement, attached as Exhibit A hereto. The Agreement provides that it "and any cause of action arising out of the employment relationship shall be governed by the laws of the state in which Employee last worked for the Company, without regard to its conflicts of laws principles." Agreement, § 4.2.

Defendant acknowledged in Section 3.1 of the Agreement that she "will learn the Company's business affairs, finances, management, marketing programs, philosophy, customers, and methods of doing business." *Id.*, § 3.1. She further acknowledged that she "will have access to confidential information maintained at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers." *Id.* Additionally, Defendant agreed that "[t]his information is proprietary to the Company and, if used by competitors or other third parties, could cause substantial and irreparable damage to the Company." *Id.*

In **Section 3.1** of the Employment Agreement, entitled "Confidentiality," Defendant agreed that, both during and after her employment by Roth Staffing, she will not use, divulge, disclose or communicate any of the Company's confidential information. More specifically, Defendant agreed as follows:

> Employee specifically agrees that he/she will not at any time, whether during or subsequent to the term of Employee's employment by the Company, in any fashion, form, or manner, unless specifically consented to in writing by the Company, either directly or indirectly, use or divulge, disclose or communicate to any person, firm, or corporation, in any manner whatsoever, any confidential information of any kind, nature, or description concerning any matters affecting or relating to the business of the Company . . . .

*Id.* Defendant agreed that Roth Staffing's confidential information includes, but is not limited to:

> customer lists, qualified prospective customer lists, employee lists, qualified prospective employee lists, sales and marketing information, customer account records, training and operations materials, personnel records, code books, pricing information, financial information, or any other confidential information of, about, or concerning the business of the Company, its manner of operation, or other confidential data of any kind, nature, or description.

*Id.* Defendant and Roth Staffing stipulated that "the same are important, material, and confidential trade secrets and affect the successful conduct of the Company's business and its goodwill, and that any breach of any term of this paragraph is a material breach of this Agreement." *Id.* In Section 3.1 of the Employment Agreement, Defendant also agreed as follows:

> All equipment, notebooks, documents, memoranda, reports, computer programs, forms, files, books, correspondence, lists, other written and graphic records or other information storage devices, and the like, including innovations, ideas and developments, affecting or relating to the business of the Company, which Employee shall prepare, use, construct, observe, possess, or control shall be and remain the Company's sole property.

*Id.*

In **Section 3.2** of the Employment Agreement, entitled "Employee's Duties on Termination," Defendant agreed to return all Company property and not to maintain any copies of any Company confidential information or other Company property. Section 3.2 provides:

> In the event of termination of employment with the Company, Employee agrees to deliver promptly to the Company all property of the Company (including, without limitation, confidential information, keys, access cards, computers/laptops, computer software and hardware, flash drives and other computer storage devices, equipment, notebooks, documents, memoranda, reports, files, samples, books, correspondence, lists, or other written or graphic records, and the like) relating to the Company's business, which are or have been in his/her possession or under his/her control. Employee shall permanently delete copies of any Company confidential information and other Company property that Employee has on any personal electronic equipment or media and upon the Company's request will permit the Company to verify such deletions.

*Id.*, § 3.2

In **Section 3.3** of the Employment Agreement, entitled "Competition," Defendant agreed that for a period of one (1) year after the end of her employment, she will not compete with Roth Staffing within 25 miles of any Company location at which she worked or was assigned. More specifically, Defendant agreed that she will not:

> directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with the Company . . . within 25 miles of any location at which Employee worked, was assigned, or over which the Employee had responsibility or supervisory authority.

*Id.*, § 3.3.

In **Section 3.6** of the Employment Agreement, entitled "Solicitation of Customers or Prospective Customers," Defendant agreed that for a period of one (1) year after the end of her employment, she "will not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customers or potential customers of the Company with whom [she] did business within the last 18 months of employment for the purpose of promoting or selling any products or services competitive with those of the Company." *Id.*, § 3.6.

In **Section 4.3** of the Employment Agreement, entitled "Tolling and Severability," Defendant agreed "that the time provisions contained in Sections 3.3, 3.5 and 3.6 shall be tolled by the length of time during which [she] is in breach of said provisions." *Id.*, § 4.3. She also agreed that, if any portion of the Agreement is determined by any court of competent jurisdiction to be invalid, "the remainder of the Agreement will remain in full force and given an effect as near as possible to the original intent of the parties." *Id.* Defendant also agreed that the restrictions in Article III of the Agreement are "reasonable for the purpose of protecting the Company's Proprietary Information," and that, if any of those restrictions is found by any court

of competent jurisdiction "to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area," it "shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable." *Id.*

In **Section 4.4** of the Employment Agreement, Defendant agreed that if she or anyone acting for her "breaches or threatens to breach Sections 3.2 through 3.6" of the Employment Agreement, Roth Staffing "shall have the right to seek equitable/injunctive relief, including a temporary restraining order, a preliminary injunction, and final or permanent injunctions enjoining and restraining such breach or threatened breach," and that such remedies "shall be in addition to all other remedies available at law or in equity for such breaches, including damages, costs, and reasonable attorneys' fees." *Id.*, § 4.4.

### C. Defendant's Resignation from Roth Staffing and Employment by SNI Companies

On the morning of April 24, 2015, Defendant forwarded several emails from her Roth Staffing email account to her personal email account. Those emails concerned a paralegal position that defendant was involved in filling for a law firm client in West Hartford, Connecticut, and receptionist and administrative assistant positions that she was involved in filling for a law firm client in Simsbury, Connecticut. Defendant also sent herself a copy of Roth Staffing's fee agreement with the Simsbury client, and emails pertaining to potential candidates for the law firm positions. Ver. Compl., ¶ 33.

On the morning of May 7, 2015, defendant used her Roth Staffing email to send a copy of her Employment Agreement to her personal email account. She also sent documents to her personal email account regarding Roth Staffing's methods for selling staffing services to customers and potential customers. *Id.*, ¶ 34. That afternoon, defendant resigned by telephone to

DelVecchio. Defendant did not tell DelVecchio that she had accepted a position with a Roth Staffing competitor approximately five miles away from Roth Staffing's Hartford office. Although defendant offered to work a two-week "notice period" with Roth Staffing, after she hung up the phone she packed up all of her belongings and left the office without notifying DelVecchio. *Id.*, ¶ 35.

At some point after May 7, 2015, defendant began working as the managing director of SNI Companies' West Hartford office, which is located at 433 South Main Street in West Hartford. SNI Companies' West Hartford office is approximately five miles away from Roth Staffing's Hartford office, which is located at 280 Trumbull Street in Hartford. SNI Companies is a large, national staffing company based in Des Moines, Iowa, which offers staffing, recruiting, and administrative services in competition with Roth Staffing throughout Connecticut and nationwide. *Id.*, ¶ 36.

Defendant, in concert with and on behalf of SNI Companies, continues to sell and provide staffing services in competition with Roth Staffing within a 25-mile radius of offices where she worked for Roth Staffing. *Id.*, ¶ 37. Roth Staffing recently learned that Ward has solicited, induced or influenced, or sought to induce or influence, a Hartford-based customer of Roth Staffing for the purpose of promoting or selling staffing services in competition with Roth Staffing. The Hartford-based customer is a law firm with whom defendant did business during the last 18 months of her employment with Roth Staffing. *Id.*, ¶ 38.

As a direct and proximate result of defendant's actions including, but not limited to, her breach of the Agreement, Roth Staffing has been, and continues to be, damaged in an amount that is impossible to ascertain unless defendant is enjoined from the aforementioned conduct. If defendant is not so enjoined, Roth Staffing will continue to be irreparably harmed by, among

other things, loss of goodwill, loss of customers, and loss of business information, and will continue to suffer present and future economic loss. *Id.*, ¶ 39. Roth Staffing has already suffered and will continue to suffer irreparable injury and harm to its business, and monetary damages alone are an inadequate redress for such continuing injury. *Id.*, ¶ 40.

## III. ARGUMENT

### A. Legal Standard for Preliminary Injunctions

To obtain a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, the moving party must show: (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the moving party.[2] *E.g., Citigroup Global Markets, Inc. v. VGC Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010); *Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *24-25.

### B. Roth Staffing Has Suffered, and Will Continue to Suffer, Irreparable Harm in the Absence of a Preliminary Injunction.

Irreparable harm "'may be assumed in cases where the plaintiff alleges a breach of a restrictive covenant.'" *Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *37 (collecting cases); *accord Hartford Elec. Light Co. v. Levitz*, 173 Conn. 15, 22 (1977) ("restrictive covenant may be enforced by injunction without a showing that violation of the covenant will cause harm to the plaintiff, so long as such relief is not inequitable"); *Access Am. LLC v. Mazzotta*, No. CV054003389, 2005 Conn. Super. LEXIS 2597, at *4-5 (Sept. 14, 2005) (Silbert, J.) (holding that breach of restrictive covenant establishes irreparable harm and lack of adequate remedy at law). Irreparable harm may also be presumed when the defendant possesses her former

---

[2]     If the Court finds that Roth Staffing is likely to succeed on the merits, then Roth Staffing need not show that a balance of the hardships tips decidedly in its favor. *See United Rentals, Inc. v. Frey*, No. 3:10CV1628 (HBF), 2011 U.S. Dist. LEXIS 16375, at *14 n.9 (D. Conn. Feb. 18, 2011) ("Frey") (rejecting defendant's argument that plaintiff must show both a likelihood of success on the merits and a balance of hardships tipping in its favor).

employer's confidential information at the time she accepts employment with a competitor, because the employee "is likely, even inadvertently," to rely upon or disclose that information in the course of her new employment. *Frey*, 2011 U.S. Dist. LEXIS 16375 at *28 (internal quotation marks omitted) (collecting cases).

Through defendant's employment with Roth Staffing, she learned the Company's business affairs, finances, management, marketing programs, philosophy, customers, and methods of doing business. *See* Ver. Compl, ¶¶ 21-22; Agreement, § 3.1. She also had access to confidential information maintained at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers. Agreement, § 3.1. Defendant violated the Agreement by converting and retaining the Company's confidential information pertaining to its customers, candidates, and methods for selling staffing services to customers and potential customers. Ver. Compl., ¶¶ 33-34. Defendant also violated, and continues to violate, the Agreement by working for a competitor of Roth Staffing within a 25-mile radius of the office(s) where she worked for Roth Staffing. *Id.*, ¶¶ 36-37; Agreement, § 3.3. Moreover, Roth Staffing has received information that defendant has solicited, induced, or influenced, or attempted to induce or influence, at least one of the customers she did business with during the last 18 months of her employment with Roth Staffing, for the purpose of selling products or services in competition with those of Roth Staffing. Ver. Compl., ¶ 38; Agreement, § 3.6.

These allegations are more than sufficient to show irreparable harm. *See, e.g., Roth Staffing*, 2015 U.S. Dist. LEXIS 61823 at *8-9 ("the record evidence shows that [defendant] solicited clients from his former employer and 'the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm'"); *see also Frey*, 2011

U.S. Dist. LEXIS 16375 at *27; *United Rentals, Inc. v. Bastanzi*, No. 3:05CV596 (RNC), 2005 U.S. Dist. LEXIS 45268, at *25 (D. Conn. Dec. 22, 2005) ("Bastanzi"). Indeed, due to the similarity between defendant's former role with Roth Staffing and her new role with SNI Companies, she inevitably will use or disclose Roth Staffing's confidential information if she is permitted to continue her employment with SNI Companies in violation of the Agreement. *See, e.g., Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 2d 137, 147 (D. Conn. 1997).

In fact, defendant acknowledged that if Roth Staffing's confidential information is used by competitors or other third parties, it "could cause substantial and irreparable damage to the Company." Agreement, § 3.1. Defendant's "signature on the Agreement is an acknowledgement, if not an admission, [or] at least evidence and a recognition of the reality that money damages are not sufficient to remedy the loss" to Roth Staffing. *Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *42 (internal quotation marks omitted); *accord Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999). For all of the foregoing reasons, Roth Staffing has suffered, and will continue to suffer, irreparable harm in the absence of a preliminary injunction.

### C. Roth Staffing is Likely to Succeed on the Merits of Its Claim for Breach of Contract.

To obtain a preliminary injunction, Roth Staffing "need not show that success is an absolute certainty." *Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *25 (internal quotation marks omitted). It only needs to show "that the probability of [its] prevailing is better than fifty percent. There may remain considerable room for doubt." *Id.* (internal quotation marks omitted). Based on the information that Roth Staffing has received to date, it can show a likelihood of success on the merits of its claim for breach of contract. It can also show that the Agreement is reasonable and enforceable under Connecticut law.

The elements of a breach of contract claim under Connecticut law are (1) formation of

the agreement, (2) performance by one party, (3) breach by the other party, and (4) damages. *United Rentals, Inc. v. Price*, 473 F. Supp. 2d 342, 346 (D. Conn. 2007). Each of these elements is met in this case. The Agreement was properly formed and supported by consideration. *See, e.g., VBrick Sys. v. Stephens*, No. 3:08-CV-1979 (CFD), at *25 (D. Conn. May 27, 2009) (Droney, J.) (continued employment adequate consideration to support non-compete covenant of at-will employee). Roth Staffing performed its part of the Agreement, and defendant's breach of the Agreement constitutes irreparable harm to Roth Staffing. *See* Ver. Compl., ¶¶ 23, 33-40; *id.*, Count I, ¶¶ 41-47; Agreement, §§ 3.1, 3.3, 3.6; *see also Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *32-33, *37.

Under Connecticut law, post-employment restrictive covenants are enforceable if they are reasonable in the following respects: (1) The length of time of the restriction; (2) the geographic area covered; (3) the fairness of the protection to the employer; (4) the extent of the restraint on the employee; and (5) the impact on the public's interests. *Robert S. Weiss & Assoc., Inc. v. Wiederlight*, 208 Conn. 525, 529 n.2 (1988). The former employee, as the party resisting enforcement of a restrictive covenant, has the burden of proving that the covenant is unreasonable. *Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *26.

### 1.    The One-Year Time Restriction is Reasonable.

The one-year duration of the Agreement's noncompetition (Section 3.3) and anti-solicitation (Section 3.6) provisions is eminently reasonable. *See Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *27. Connecticut courts regularly enforce post-employment restrictive covenants having durations of longer than one year. *See, e.g., Schoonmaker v. Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416 (2000) (upholding three-year restriction); *Robert S. Weiss & Assoc.*, 208 Conn. at 531 (two-year restriction); *Scott*, 171 Conn. at 140 (five-year

restriction).

### 2. The Geographic Restriction is Reasonable.

Section 3.3 of the Agreement restricts defendant from competing with Roth Staffing within a 25 mile radius of the office(s) where she worked. Section 3.6 restricts defendant from soliciting, inducing, or influencing – or attempting to induce or influence – any customer or prospective customer with whom she did business during the last 18 months of her employment. Both of these restrictions are reasonable under Connecticut law. *See, e.g., Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *27-28.

The agreement at issue in *Roth Staffing v. Brown* included noncompetition and anti-solicitation covenants that were similar to Sections 3.3 and 3.6 of defendant's Agreement in this case. *See id.* at *11-12. Granting Roth Staffing's motion for preliminary injunction, the Honorable Joan Glazer Margolis held that the 25-mile restriction "in Section 3.3 is reasonably limited to the area in which Roth Staffing Hartford's office does business"; *id.* at *27; and that Section 3.6 is a reasonable "customer-specific" restriction. *Id.* at *28 (citing *Robert S. Weiss*, 208 Conn. at 531-32). In approving and adopting Judge Margolis's decision, the Honorable Janet Bond Arterton observed that "the one-year and 25-mile limitations in the restrictive covenant are well within the realm of reasonable to protect Roth Staffing's business interests in the Hartford area and greater restrictions have been upheld by Connecticut courts." *Roth Staffing*, 2015 U.S. Dist. LEXIS 61823 at *6 (collecting cases); *accord Minnesota Mining & Mfg. Co. v. Francavilla*, 191 F. Supp. 2d 270, 280-81 (D. Conn. 2002) ("3M") (upholding agreement that protected company "in the United States or in any country in which [it] has a plant for manufacturing a product upon which [the employee] worked"); *Scott*, 171 Conn. at 138 (enforcing statewide restriction).

15.

**3. The Agreement Provides a Fair Degree of Protection to Roth Staffing.**

Connecticut courts will enforce a restriction which "afford[s] only a fair protection to the interest of the party in whose favor it is made . . . ." *Van Dyck Printing Co. v. DiNicola*, 43 Conn. Supp. 191, 197 (1993) (Hodgson, J.) (internal quotation marks omitted), *aff'd*, 231 Conn. 272 (1994) (per curiam). In the *Brown* case, the court held that the agreement was a reasonable measure to protect its customer relationships. *Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *29. "Given the nature of the plaintiff's customer-driven business, it is reasonable for it to be concerned that an employee with extensive relationships with its customers, such as the [defendant], might be in a position to threaten its business if the employee works for a competitor." *Id.* (internal quotation marks omitted).

The Agreement is consistent with an employer's "legitimate goal" of allowing a period of time in which to restaff the employees who serve its customers "without losing the accounts to the appropriation by the defendant of the accumulated goodwill and familiarity built up by the plaintiff as [her] employer." *Van Dyck Printing Co.*, 43 Conn. Supp. at 198. The Agreement is also designed to protect Roth Staffing's trade secrets and other confidential information. *See* Agreement, §§ 3.1, 3.2. Given the similarity between defendant's former role as practice manager for Roth Staffing's Ultimate Staffing office in Hartford, and her current role as managing director of SNI Companies' office in West Hartford, it is inevitable that defendant, either intentionally or inadvertently, will rely upon Roth Staffing's confidential information in the course of competing with Roth Staffing in the staffing, recruiting, and administrative services industry. *See Frey*, 2011 U.S. Dist. LEXIS 16375 at *26; *Weseley Software*, 977 F. Supp. 2d at 147. Accordingly, the Agreement affords a fair degree of protection to Roth Staffing.

16.

### 4. The Agreement Does Not Unduly Restrict Defendant's Ability to Earn a Living.

By their very nature, restrictive covenants affect employees' opportunities to pursue their occupations. However, this Agreement "does not do so unreasonably." *Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *30. The noncompetition provision in Section 3.3 does not restrict defendant from working for a competitor beyond the 25-mile radius, nor does it restrict her from working for a non-competitor within that radius or anywhere else in the world. *See 3M*, 191 F. Supp. 2d at 281 ("the restrictive covenant does not attempt to prohibit the defendant from working for an organization that is not a competitor"). The anti-solicitation provision in Section 3.6 does not restrict defendant from soliciting any customers other than those she worked with during the last 18 months of her employment with Roth Staffing. Even with regard to those customers, defendant is not restricted from soliciting those customers for the purpose of selling products or services which do not compete with those of Roth Staffing. Accordingly, the Agreement does not unduly restrict defendant's ability to earn a living.

### 5. Enforcing the Agreement Will Not Interfere With the Public Interest.

Enforcement of the Agreement will not have any cognizable impact upon the public interest. *See Roth Staffing*, 2015 U.S. Dist. LEXIS at 61823 at *7. If anything, to *not* enforce the Agreement would unreasonably interfere with the public policy in favor of recognizing the enforceability of freely made contracts. *See, e.g., New Haven Tobacco Co. v. Perrelli*, 11 Conn. App. 636, 641 (1987) (recognizing Connecticut's "public interest in requiring those who have freely entered into an agreement, and who have received a benefit for doing so, to abide by the terms of the agreement"). To allow defendant's breach to go unchecked would send a negative message that employees are free to breach their contractual obligations as it suits them. For all of the foregoing reasons, the Agreement is reasonable and enforceable.

**D. Roth Staffing is Likely to Succeed on the Merits of its CUTSA Claim.**

The CUTSA authorizes the Court to enjoin the actual or threatened misappropriation of a trade secret. Conn. Gen. Stat. § 35-52(a).[3] As practice manager of the Ultimate Staffing business in Roth Staffing's Hartford office, defendant had access to a significant amount of proprietary and confidential information, which she acknowledged are "important, material, and confidential trade secrets" that "affect the successful conduct of the Company's business and its goodwill . . . ." Agreement, § 3.1. This includes the information pertaining to Roth Staffing's customers, job candidates, and sales methods, which defendant forwarded to her personal email account shortly before she resigned to become the managing director of SNI Companies' West Hartford office. *Id.*; Ver. Compl., ¶¶ 33-36.

These facts are more than sufficient for a preliminary injunction under the CUTSA. *See, e.g., Roth Staffing*, 2013 U.S. Dist. LEXIS 189650 at *33-34 (finding likelihood of success on CUTSA claim where defendant had access to trade secrets during employment with Roth Staffing); *MacDermid, Inc. v. Selle*, 535 F. Supp. 2d 308, 317 (D. Conn. 2008) (granting preliminary injunction under CUTSA and concluding that "some of [plaintiff's] trade secrets are likely at risk" due to the parties' competition for the same customers in the same geographic area); *see also PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (affirming preliminary injunction preventing defendant from working where he "would necessarily be making decisions" by relying on knowledge of former employer's marketing and sales plans,

---

[3]    The CUTSA defines "trade secret" as any information, "including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Id. § 35-51(d). "Misappropriation" includes the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of disclosure or use, knew or had reason to know that [her] knowledge of the trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ; or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . ." Conn. Gen. Stat. § 35-51(b)(2)(B)(ii).

which were trade secrets); *Estee Lauder Cos. v. Baltra*, 430 F. Supp. 2d 158, 176 (S.D.N.Y. 2006) (preliminarily enjoining employee who had knowledge of confidential marketing and product plans from working for competitor). Accordingly, the Court should grant a preliminary injunction under the CUTSA to prevent both the actual and threatened misappropriation of Roth Staffing's trade secrets.

## E. There Are Sufficiently Serious Questions Going to the Merits, and a Balance of Hardships Tips Decidedly Toward Roth Staffing.

Roth Staffing's showing of irreparable harm and a likelihood of success on the merits provide a sufficient basis to grant the requested preliminary injunction. *See Citigroup Global Markets, Inc.*, 598 F.3d at 35. However, even if the Court does not find a likelihood of success on the merits, Roth Staffing is still entitled to a preliminary injunction on the alternative ground that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the moving party." *Id.*

Here, defendant is blatantly breaching the noncompetition provision in her Agreement with Roth Staffing. Defendant's actions on behalf of herself and her new employer, in competition with her former employer, endanger Roth Staffing's customer relationships and goodwill in the marketplace, as well as the confidentiality of its confidential business information. Moreover, given the similarity between her former role with Roth Staffing and her new position with SNI Companies, it is inevitable that Defendant will be required to use or disclose Roth Staffing's confidential business information – such as methodologies, pricing, customer requirements and other customer-specific information – in the course of her employment with SNI Companies. Accordingly, there are serious questions going to the merits of this case. Since the requested preliminary injunction would only preclude defendant for one year from soliciting specific customers or prospective customers of Roth Staffing and from

competing with Roth Staffing within a specific geographic area, the balance of the hardships tips decidedly in favor of Roth Staffing, which has suffered and will continue to suffer irreparable harm in the absence of an injunction.

## IV.   CONCLUSION

For all the foregoing reasons, this Court should grant Roth Staffing's Motion for Preliminary Injunction.  Moreover, under the circumstances of this case, the Court should exercise its discretion to dispense with the requirement of a bond under Fed. R. Civ. P. 65(c). *See, e.g., Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420, 428 (D. Conn. 2004).

Respectfully submitted,

PLAINTIFF, ROTH STAFFING
COMPANIES, L.P.

/s/ Stephen P. Rosenberg
Stephen P. Rosenberg (ct26601)
LITTLER MENDELSON, P.C.
One Century Tower
265 Church Street, Suite 300
New Haven, CT  06510
Telephone: 203.974.8700
Facsimile: 203.974.8799
sprosenberg@littler.com

# Exhibit A

# EMPLOYMENT AGREEMENT

### (rev. 5/13)

This Employment Agreement is made and entered into by and between Roth Staffing Companies, L.P. a California limited partnership (the "Company") and Wendy Ward (the "Employee"), effective July 19, 2013.

## AGREEMENT

In consideration of the mutual promises set forth in this Agreement, including, but not limited to, the Company's employment, continued employment, promotion or reassignment of the Employee, new or additional compensation to the Employee, specialized training and access to new and different confidential information, benefits provided under the Company's "From the Heart" Program, any one or more of which the Employee hereby acknowledges to be good and sufficient consideration, the receipt and sufficiency of which the Employee hereby acknowledges, the parties agree as follows:

## ARTICLE I.
## EMPLOYMENT

### 1.1  Employment.

The Company hereby agrees to employ the Employee and the Employee hereby agrees to serve the Company in the capacity of Practice Manager, at the Ultimate Staffing, Hartford, Connecticut, branch location. Such employment shall be based upon the terms and conditions set forth in this Agreement.

### 1.2  Duties and Responsibilities.

During the term of employment, the Employee shall devote full time, efforts, abilities, and energies to the Company's business. The Employee shall use best efforts, skill, and abilities to promote the general welfare and interests of the Company, and any related enterprises of the Company. The Employee shall loyally, conscientiously, and professionally do and perform all such duties and responsibilities as shall be reasonably assigned by the Company and the Employee's superiors from time to time. Any job description that describes the duties and responsibilities of the Employee may be revised from time to time. The Employee shall at all times during the period of employment strictly adhere to and obey all rules, policies, and guidelines established by the Company for its employees, as such rules, policies, and guidelines are now in effect or as they may be modified by the Company, in its sole discretion, from time to time. The Employee shall not, directly or indirectly, render any services of a business, commercial or professional nature to any other person, firm or organization, whether for compensation or otherwise, while employed by the Company, unless the prior written consent of the Company has first been obtained. The Employee shall not use any confidential information belonging to a former employer during the course of employment with the Company.

### 1.3  At-Will Agreement.

The Employee's employment with the Company is for an unspecified term and is at-will. Accordingly, either the Employee or the Company can terminate the employment relationship at

will, at any time, with or without cause or prior notice. This at-will aspect of the Employee's employment, which includes the right of the Company to demote, transfer or discipline the Employee with or without cause or prior notice, cannot be changed, waived or modified, except by an individualized written employment contract to the contrary, signed by both the Employee and the Chief Executive Officer of the Company.

### 1.4 Location.

During the term of employment, the Employee shall perform his/her duties at any location owned and/or operated by the Company or any related company or at such other place or places as may be designated by the Company from time to time.

## ARTICLE II.
## COMPENSATION

### 2.1 Salary.

The Company shall pay Employee, and Employee shall accept from the Company in full payment for Employee's services hereunder, **$2,576.92 per bi-weekly pay period** (or in accordance with the Company's then-current payroll policy), which equates to **$67,000.00 on an annualized basis**. Adjustments to Employee's compensation shall be made in a manner that is consistent with the Company's policies and procedures.

### 2.2 Employee Benefits.

Employee is eligible to participate in Company employee benefit programs under the terms of the then-existing Company policies commensurate with other Company employees at the same level as the Employee. These employee benefit programs currently include sick leave, vacation, medical, dental, vision, short-term and long-term disability, life insurance, and 401(k) plan.

Currently, Employee is eligible to earn vacation, which increases with the length of employment as shown in the following schedule.[1] Vacation earnings are accrued daily for Regular Full-Time Employees.

| Employment Period | Vacation Hours Per Year | Maximum Accrual |
|---|---|---|
| Each pay period from date of hire through 24 months | **96 hrs (12 days)** | **105.6 hrs (13.2 days)** |
| 25 months through 60 months | **112 hrs (14 days)** | **123.2 hrs (15.4 days)** |
| 61 months through 108 months | **136 hrs (17 days)** | **149.6 hrs (18.7 days)** |

---

[1] This schedule supersedes any accrual schedule contained in the Company's Employee Handbook as of Employee's start date, but may be modified from time to time.

| | | |
|---|---|---|
| 109 months + | **176 hrs** <br> **(22 days)** | **193.6 hrs** <br> **(24.2 days)** |

In addition, eligible regular full-time employees will accrue sick leave benefits at the rate of 1.55 hours per bi-weekly pay period up to a maximum of 161.2 hours (20 days).[2]

### 2.3 From the Heart Program.

Employee shall also be eligible for certain benefits under the Company's From the Heart Program, including, but not limited to, the RAD Days Program applicable to Employee's position, gym membership contributions, and the Community Volunteer Program. Company benefits and programs may be modified from time to time.

### 2.4 Bonus.

In addition to the salary specified in Section 2.1, the Employee shall be eligible to receive bonuses based on the terms and conditions of the **Branch Manager B/Practice Manager Bonus Program**, which may be amended or modified from time to time. Employee must complete the entire designated bonus period to earn the bonus. Please refer to the **Branch Manager B/Practice Manager Bonus Program and the Bonuses and Commissions Terms and Conditions** for the entire bonus criteria.

### 2.5 Auto Reimbursement.

Employee shall receive $.565 per mile (based on IRS guidelines and Company policy, subject to change), paid monthly as auto reimbursement for the use of a personal automobile on Company business.

### 2.6 Business Expenses.

Employee shall be reimbursed monthly for all Company-related business expenses that are pre-approved by his/her manager.

### 2.7 Integration Clause.

No one in the Company, other than its CEO, has the right to alter the at-will nature of the employment relationship or to change the provisions in Section 1.2. regarding the employment relationship. The CEO may only alter the nature of the employment relationship if he does so in a written agreement signed both by the CEO and the Employee. Furthermore, there are not now and may not in the future be any implied or oral agreements, covenants, or obligations that in any way affect or impair the ability of the Employee or the Company to terminate the employment relationship at will, at any time. Specifically, the Company's policies and procedures and/or Employee Handbook do not constitute a guarantee of continued employment between the Employee and the Company.

---

[2] This accrual rate supersedes any accrual rate contained in the Company's Employee Handbook as of Employee's start date, but may be modified from time to time.

# ARTICLE III.
## CONFIDENTIALITY AND RESTRICTIVE COVENANTS

### 3.1   Confidentiality.

Employee will learn Company's business affairs, finances, management, marketing programs, philosophy, customers, and methods of doing business. Employee will have access to confidential information maintained at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers. This information is proprietary to the Company and, if used by competitors or other third parties, could cause substantial and irreparable damage to the Company.

Employee specifically agrees that he/she will not at any time, whether during or subsequent to the term of Employee's employment by the Company, in any fashion, form, or manner, unless specifically consented to in writing by the Company, either directly or indirectly, use or divulge, disclose or communicate to any person, firm, or corporation, in any manner whatsoever, any confidential information of any kind, nature, or description concerning any matters affecting or relating to the business of the Company, including, without limiting the generality of the foregoing, customer lists, qualified prospective customer lists, employee lists, qualified prospective employee lists, sales and marketing information, customer account records, training and operations materials, personnel records, code books, pricing information, financial information, or any other confidential information of, about, or concerning the business of the Company, its manner of operation, or other confidential data of any kind, nature, or description. The parties hereto stipulate that as between them, the same are important, material, and confidential trade secrets and affect the successful conduct of the Company's business and its goodwill, and that any breach of any term of this paragraph is a material breach of this Agreement. All equipment, notebooks, documents, memoranda, reports, computer programs, forms, files, books, correspondence, lists, other written and graphic records or other information storage devices, and the like, including innovations, ideas and developments, affecting or relating to the business of the Company, which Employee shall prepare, use, construct, observe, possess, or control shall be and remain the Company's sole property.

### 3.2   Employee's Duties on Termination.

In the event of termination of employment with the Company, Employee agrees to deliver promptly to the Company all property of the Company (including, without limitation, confidential information, keys, access cards, computers/laptops, computer software and hardware, flash drives and other computer storage devices, equipment, notebooks, documents, memoranda, reports, files, samples, books, correspondence, lists, or other written or graphic records, and the like) relating to the Company's business, which are or have been in his/her possession or under his/her control. Employee shall permanently delete copies of any Company confidential information and other Company property that Employee has on any personal electronic equipment or media and upon the Company's request will permit the Company to verify such deletions.

3.3 **Competition.**

During the term of employment, Employee agrees that he/she will not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with the Company, other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange. For a period of one year after Employee's employment terminates (regardless of the reason for termination or whether such termination was by the Company or Employee), Employee agrees that he/she shall not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with the Company (other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange) within 25 miles of any location at which Employee worked, was assigned, or over which the Employee had responsibility or supervisory authority.

3.4 **Organization of Competitive Business.**

During the term of employment, Employee agrees that he/she will not undertake planning for or organization of any business activity competitive with the Company's business or combine or conspire with other employees or representatives of the Company's business for the purpose of organizing any such competitive business activity.

3.5 **Solicitation of Employees.**

During the term of this Agreement and for a period of one year after the employment relationship between the parties terminates (regardless of the reason for termination or whether such termination was by the Company or Employee), Employee agrees that he/she will not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any person who is engaged (as a temporary or regular employee, agent, independent contractor, or otherwise) by the Company to terminate his or her employment or engagement. This section 3.5 shall only apply to persons Employee learned of or became familiar with as a result of the employment relationship.

3.6 **Solicitation of Customers or Prospective Customers.**

During the term of this Agreement and for one year after the employment relationship between the parties terminates (regardless of the reason for termination or whether such termination was by the Company or Employee), Employee agrees that he/she will not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customers or potential customers of the Company with whom he/she did business within the last 18 months of employment for the purpose of promoting or selling any products or services competitive with those of the Company.

3.7 **Intellectual Property.**

Employee agrees that all inventions (whether or not protected under patent laws), works of authorship, information fixed in any tangible medium (whether or not protected under

copyright laws), artwork, graphics, ideas, algorithms, market research, strategies, incoming and outgoing electronic communications, source code and documentation, software programs, existing and prospective clients' information, existing and prospective employees'/candidates' information, moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas (whether or not protected under trade secret laws), and all other subject matter protected under patent, copyright, moral right, mask work, trademark, trade secret, or other laws, including without limitation all new or useful art, combinations, discoveries, formulae, manufacturing techniques, technical developments, artwork, software, programming, applets, scripts, and designs written, developed, originated, fixed or reduced to practice by Employee (collectively, "Works") shall be the sole and exclusive property of the Company. Works shall include all information relating to clients and candidates collected by Employee in any manner by any means through any media during Employee's employment. Employee hereby assigns, transfers and conveys to the Company, exclusively and perpetually, all worldwide right, title, and interest in any and all services and Works and any and all resulting copyrights, patents and trade secrets to the Company (collectively, "Proprietary Rights"). Employee agrees to execute such documents and do such acts as may be necessary to perfect, register and enforce the Company's Proprietary Rights at no charge to the Company.

### ARTICLE IV.
### MISCELLANEOUS

4.1 **Arbitration of Controversies**.
Employee expressly acknowledges and agrees that, to the fullest extent allowed by law, any controversy, claim or dispute between Employee and the Company (and/or any of its affiliates, divisions, owners, shareholders, directors, partners, members, officers, employees, volunteers or agents) relating to or arising out of Employee's employment or the cessation of that employment will be submitted to final and binding arbitration before a neutral arbitrator in the county in which Employee work(ed) for determination pursuant to the Federal Arbitration Act, and administered by JAMS or the American Arbitration Association in accordance with JAMS' Employment Arbitration Rules and Procedures (which can be accessed at www.jamsadr.com/rules-employment-arbitration) or with the American Arbitration Association's National Rules for the Resolution of Employment Disputes (which can be accessed at www.adr.org/sp.asp?id=32904), respectively, as the exclusive remedy for such controversy, claim or dispute.

In any such arbitration, the parties may conduct discovery to the same extent as would be permitted in a court of law. The arbitrator shall issue a written decision stating the essential findings and conclusions on which the award is based, and shall have full authority to award all remedies that would be available in court. The Company shall pay all arbitrator's fees and any arbitration administrative expenses, to the extent required by law. Any judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

This bi-lateral arbitration agreement covers, but is not limited to, claims of unpaid wages, breach of contract, torts, violation of public policy, discrimination, harassment, or any other employment-related claims under laws including but not limited to, Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act, the Age Discrimination in Employment Act,

the Equal Pay Act, the Fair Labor Standards Act, the Family Medical Leave Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Labor Code, and any other statutes, laws, or regulations relating to an employee's relationship with his/her employer, regardless of whether such dispute is initiated by the employee or the Company. HOWEVER, EMPLOYEE SHALL HAVE NO RIGHT OR AUTHORITY TO HAVE ANY DISPUTE BROUGHT, HEARD, OR ARBITRATED AS A CLASS ACTION, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR IN A REPRESENTATIVE CAPACITY ON BEHALF OF ANY PERSON NOR SHALL EMPLOYEE HAVE ANY RIGHT OR AUTHORITY TO JOIN ANY SUCH ACTION. FURTHERMORE, THE ARBITRATOR SHALL HAVE NO RIGHT TO CERTIFY, CONSOLIDATE, OR COLLECTIVELY ARBITRATE MULTIPLE INDEPENDENT CLAIMS. This Agreement also covers any and all claims that the Company may have against Employee, including (but not limited to) claims for misappropriation of Company property, disclosure of proprietary information or trade secrets, interference with contract, trade libel, gross negligence, or any other claim for alleged wrongful conduct or breach of the duty of loyalty. This arbitration requirement does not apply to claims for workers' compensation benefits, unemployment claims, benefit claims that culminate in another arbitration process, claims arising under the National Labor Relations Act, claims arising under ERISA (29 U.S.C. §§ 1001 et. seq.), any other claims where mandatory arbitration is prohibited by law, or charges filed with federal or state administrative agencies alleging violations of federal and state laws prohibiting discrimination, harassment, and retaliation; however, Employee agrees to waive Employee's right to recover monetary damage in connection with any such charge, complaint, or lawsuit that may be filed by such administrative agency and agrees that relief obtained through binding arbitration will be Employee's exclusive individual remedy. In addition, nothing in this Agreement shall prevent the Company or Employee from applying to courts for provisional remedies . BY AGREEING TO THIS BINDING ARBITRATION PROVISION, BOTH EMPLOYEE AND THE COMPANY GIVE UP ALL RIGHTS TO A TRIAL BY JURY. This bi-lateral arbitration agreement is to be construed as broadly as is permissible under applicable law.

4.2 **Governing Law and Venue.**
This Agreement and any cause of action arising out of the employment relationship shall be governed by the laws of the state in which Employee last worked for the Company, without regard to its conflicts of laws principles. Venue for any dispute involving the interpretation of this Agreement or for any cause of action arising out of the employment relationship shall be in the county in which Employee last worked for the Company. Nothing in this provision shall be interpreted to be inconsistent with the parties' agreement to arbitrate set forth in paragraph 4.1 above.

4.3 **Tolling and Severability.**
Employee agrees that the time provisions contained in Sections 3.3, 3.5 and 3.6 shall be tolled by the length of time during the period of which Employee is in breach of said provisions. Should any portion of this Agreement be determined by any arbitrator or court of competent jurisdiction to be invalid, the remainder of the Agreement will remain in full force and given an effect as near as possible to the original intent of the parties. The restrictions set forth in Article III are considered by the parties to this Agreement to be reasonable for the purpose of protecting the Company's Proprietary Information. However, if any such restriction is found by any

arbitrator or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

### 4.4    Injunction.

If Employee or anyone acting for Employee breaches or threatens to breach Sections 3.2 through 3.6 of this Agreement, the Company shall have the right to seek equitable/injunctive relief, including a temporary restraining order, a preliminary injunction, and final or permanent injunctions enjoining and restraining such breach or threatened breach. Such remedies shall be in addition to all other remedies available at law or in equity for such breaches, including damages, costs, and reasonable attorneys' fees.

### 4.5    Waiver.

Either party's failure to enforce any section or sections of this Agreement shall not in any way be construed as a waiver of any such provision or provisions, or prevent that party thereafter from enforcing each and every other provision of this Agreement.

### 4.6    Notices.

Any notice to be given to the Company under the terms of this Agreement shall be addressed to the Company at the address of its principal place of business (333 City Boulevard West, Suite 100, Orange, CA 92868), and any notice to be given to Employee shall be addressed to the Employee's home address last shown on the records of the Company, or at such other address as either party may hereafter designate in writing to the other. Any such notice shall be in writing and shall be deemed to have been duly given upon personal delivery, on the second calendar day after it has been enclosed in a properly sealed and addressed envelope and sent via nationally recognized overnight courier, or on the third calendar day after it has been enclosed in a properly sealed and addressed envelope, certified, and deposited (postage and certification fee prepaid) in a post office or branch post office regularly maintained by the United States Government.

### 4.7    Entire Agreement.

This Agreement constitutes the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes any and all other agreements, communications, understandings, promises, stipulations, arrangements, whether any of the same are either oral or in writing, or express or implied, between the parties hereto with respect to the subject matter hereof, including, but not limited to, any implied-in-law or implied-in-fact covenants or duties relating to employment or the termination of employment. No change to or modification of this Agreement shall be valid or binding unless the same shall be in writing and signed by both the Employee and the CEO of the Company.

### 4.8    Disclosure of Agreement.

The Company may disclose any portion of this Agreement to any person or organization, including actual and potential employers of Employee, without incurring liability to the Employee.

4.9   **No Set-Off By Employee.**

No demand, action, or cause of action that Employee may have against Company shall constitute a defense to the Company's enforcement of any rights under the Agreement.

IN WITNESS WHEREOF, the parties hereto acknowledge that they have read this Agreement, fully understand it, and have freely and voluntarily entered into it.

**ROTH STAFFING COMPANIES, L.P.**

By: _____

**Jennifer Simonson**
General Counsel, Senior Vice President

Dated:  July 16, 2013

By: _____

**Wendy Ward**

Dated: _7/19/13_____

I have been advised to seek the advice of an attorney before signing this Agreement, and have either done so, or decline to do so.

By: _____

**Wendy Ward**

Dated: _____

# Exhibit B

LEXSEE

## ROTH STAFFING COMPANIES, L.P. v. THOMAS BROWN and OEM PROSTAFFING, INC.

### 3:13 CV 216 (JBA)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

### 2013 U.S. Dist. LEXIS 189650

**October 16, 2013, Decided**
**October 16, 2013, Filed**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motion granted by, in part, Sanctions allowed by Roth Staffing Cos., L.P. v. Brown, 2014 U.S. Dist. LEXIS 114247 (D. Conn., Aug. 18, 2014)
Adopted by, Objection overruled by, Injunction granted at Roth Staffing Cos., L.P. v. Brown, 2015 U.S. Dist. LEXIS 61823 (D. Conn., May 12, 2015)

**COUNSEL:** [*1] For Roth Staffing Companies, L.P., Plaintiff: Stephen P. Rosenberg, LEAD ATTORNEY, Littler Mendelson, P.C.- NH, CT, New Haven, CT.

For Thomas Brown, OEM Prostaffing, Inc., Defendants: Vincent Provenzano, LEAD ATTORNEY, Mancini, Provenzano, & Futtner LLC, Southington, CT.

For OEM of CT Inc, doing business as OEM America, Defendant: Christopher L. Brigham, LEAD ATTORNEY, Jesse Aaron Langer, Updike, Kelly & Spellacy, P.C.-NH, New Haven, CT; David R. Makarewicz, LEAD ATTORNEY, Updike, Kelly & Spellacy, PC-Htfd, Hartford, CT.

**JUDGES:** Joan Glazer Margolis, United States Magistrate Judge.

**OPINION BY:** Joan Glazer Margolis

**OPINION**

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

On February 15, 2013, plaintiff Roth Staffing

Companies, L.P. ["Roth Staffing", "plaintiff," or "the Company"] commenced this diversity action against defendants Thomas Brown and OEM ProStaffing, Inc. for breach of contract (Count I), tortious interference with contract (Count II), and misappropriation of trade secrets arising out of Brown's alleged violation of the non-compete, confidentiality, and no-solicitation provisions of his Employment Agreement with Roth Staffing, under the Connecticut Uniform Trade Secrets Act ["CUTSA"], [*2] CONN. GEN. STAT. § 35-51 et seq. (Count III). (Dkt. #1). The same day, plaintiff filed the pending Motion for Preliminary Injunction and brief in support (Dkts. ##3-4),[1] along with a Motion for Order to Show Cause (Dkt. #5), the latter of which was granted on August 1, 2013. (Dkt. #38). On March 22, 2013, the pending motions were referred to this Magistrate Judge by United States District Judge Janet Bond Arterton. (Dkt. #22). After a telephone status conference was held on May 7, 2013 (see Dkts. ##27-28), a preliminary injunction hearing was scheduled for June 27, 2013. (Dkt. #29). On June 25, 2013, the parties filed a Joint Motion for Stipulated Order in which the parties stipulated to some, but not all, of the relief requested in plaintiff's Motion for Preliminary Injunction. (Dkt. #30). The next day, the parties' Stipulated Order was signed by this Magistrate Judge. (Dkt. #34). The parties also requested a continuance of the preliminary injunction hearing, which, after several conference calls, was continued to August 8, 2013. (See, e.g., Dkts. ##33, 35-37). At the August 8 hearing before this Magistrate th Judge, defendant Brown, Corey Miller, Roth Staffing's Regional Vice President, and Wendy Ward, Roth [*3] Staffing's Practice Manager, testified. (See Dkts. ##39, 40, 45). The next day, this Magistrate Judge granted plaintiff's Motion

2013 U.S. Dist. LEXIS 189650, *3

for Preliminary Injunction to the extent agreed upon by parties in the Stipulated Order, "with the additional (and continuing) injunctive relief sought by plaintiff to be addressed in this Magistrate Judge's Recommended Ruling, to be filed after the parties' post-hearing briefs have been filed." (Dkt. #41)(emphasis omitted).

> 1 Attached to plaintiff's brief in support are the following exhibits: copy of the Employment Agreement, signed on June 8, 2010 (Exh. A); copy of job listings for OEM ProStaffing (Exhs. B-C); and copies of letters from plaintiff's counsel to defendant OEM ProStaffing and defendant Brown, dated January 17, 2013, with a copy of the Employment Agreement attached (Exh. D).

On August 29, 2013, defendants filed their brief in opposition to plaintiff's Motion for Preliminary Injunction (Dkt. #46), and the next day, plaintiff filed a redacted post-hearing brief (Dkt. #48), along with an unredacted version of its post-hearing brief, filed under seal. (Dkts. ##47, 49-50).[2] On September 13, 2013, defendants filed their reply in opposition to plaintiff's [*4] post-hearing brief (Dkt. #54), and that same day, plaintiff filed its reply in further support of its Motion for Preliminary Injunction. (Dkt. #55).[3]

> 2 For ease of reference, in this Ruling, the Court will refer to plaintiff's redacted brief. (Dkt. #48). Attached to both briefs were copies of the exhibits from the August 8th hearing.
> 3 Attached to plaintiff's reply brief are copies of unpublished case law.

## I. DISCUSSION

In its Motion for Preliminary Injunction, plaintiff seeks to enjoin defendants as follows:

> 1. Defendants shall not, directly or indirectly, use or divulge, disclose or communication Roth Staffing's confidential information;
>
> 2. Brown shall not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship,

firm, association, person, or other entity which directly or indirectly competes with Roth Staffing within [twenty-five] miles of any location of Roth Staffing at which Brown worked or was assigned, other than as a passive stockholder in such corporations whose stock is traded on a recognized stock [*5] exchange;

> 3. Brown shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customer or prospective customer of Roth Staffing for the purpose of promoting or selling any products or services competitive with those of Roth Staffing. This limitation only shall apply to customers and prospective customers known to Brown or with whom Brown had contacts or dealings during his employment by Roth Staffing;
>
> 4. Brown shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any person who is engaged (as a temporary or regular employee, agent, independent contractor, or otherwise) by Roth Staffing or terminate his or her employment or engagement; and
>
> 5. Within [twenty-four] hours, Defendants shall deliver Roth Staffing any and all confidential information of Roth Staffing and any and all property of Roth Staffing which is in either of the Defendants' possession or control.

(Dkt. #3, at 1-2).

## A. STIPULATED ORDER

On June 25, 2013, the parties filed a Joint Motion for Stipulated Order Pending Ruling on Motion for Preliminary Injunction (Dkt. #30), [*6] in which Order (Dkt. #34) the parties stipulate as follows:

> 1. Defendants shall not, directly or indirectly, use or divulge, disclose or

communicate Roth Staffing's confidential information;

2. Defendants shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any Customers of Plaintiff for the purpose of promoting or selling any products or services competitive with those of Plaintiff. For purposes of this Stipulated Order, "Customers" means any and all customers known to Defendant Thomas Brown . . . or with whom Brown had contacts or dealings during his employment by Plaintiff;

3. Defendants shall not, directly or indirectly or by action in concert with others, place any candidates for temporary or permanent employment with any Customers of Plaintiff with the exception of Connecticut Spring and Stamping, and with the exception of job orders which are currently outstanding as of June 24, 2013;

4. Defendants shall not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any person who is engaged (as a temporary or regular employee, agent, independent [*7] contractor, or otherwise) by Plaintiff to terminate his or her employment or engagement; and

5. Defendants shall not request any further continuances of the hearing on Plaintiff's Motion for Preliminary Injunction, unless it is for an unforeseen medical circumstance or other unforeseen circumstance.

(Dkt. #34, at 1-2).

Thus, in the Joint Motion for Stipulated Order, the parties reached an agreement on three of the issues addressed in plaintiff's Motion for Preliminary Injunction, and such agreement was reached as to all defendants, and not limited to defendant Brown, as was originally requested in plaintiff's Motion. Specifically, the parties

stipulated to the first request of the five presented in its Motion for Preliminary Injunction, in that they have agreed that defendants "shall not, directly or indirectly, use or divulge, disclose or communicate Roth Staffing's confidential information[.]" (Compare Dkt. #3, ¶ 1 with Dkt. #34, ¶ 1). Additionally, the parties reached an agreement in part as to the third and fourth requests, which provide that defendants are enjoined from soliciting, inducing, or influencing any customers "known to Brown or with whom Brown had contacts or dealings [*8] during his employment by Roth Staffing[,]" (compare Dkt. #3, ¶ 2 with Dkt. #34, ¶ 3), and defendants shall not "solicit, induce or influence (or seek to induce or influence) any person who is engaged . . . by Roth Staffing to terminate his or her employment or engagement." (Compare Dkt. #3, ¶ 4 with Dkt. #34, ¶ 4).

In the Stipulated Order, the parties did not address plaintiff's second request, namely that defendant Brown be enjoined from future involvement with companies which directly or indirectly compete with Roth Staffing, within twenty-five miles of any Roth Staffing location at which Brown worked, nor did the parties address plaintiff's fifth request, that is defendants' return of any and all confidential information and/or of Roth Staffing which is either of the defendants' possession or control. (Dkt. #3, ¶¶ 2, 5).

B. FACTUAL FINDINGS

1. BUSINESS OF ROTH STAFFING

Plaintiff Roth Staffing is in the business of providing a variety of staffing, recruiting and administrative services, including temporary staffing and hiring, direct hiring, and executive search and recruitment. (Dkt. #45, Preliminary Injunction Hearing Transcript ["Tr."] at 3-4). Defendant Brown was first employed by [*9] plaintiff from April 2006 to Septemeber 2007, and he returned from June 2010 to September 2012; he worked out of the Hartford office, located at 280 Trumbull Street in Hartford, Connecticut. (Id. at 5, 7, 18). Brown was offered his position in a letter dated May 19, 2010, with a start date of June 7, 2010. (Hearing Exh. 1; Tr. at 7-8). Upon signing this offer letter, Brown acknowledged that his "offer of employment is contingent upon receipt of [his] signed and accepted employment agreement. . . . " (Hearing Exh. 1; Tr. at 8). Defendant Brown signed the employment agreement ["Employment Agreement"] on June 8, 2010. (Hearing Exh. 2; Tr. at 8-9).[4]

4    Brown acknowledged that he signed an employment agreement with Roth Staffing during his first employ in 2006 and the terms of the 2010 employment agreement were similar to the agreement signed in 2006. (Tr. at 10).

The Employment Agreement provides that it "and any cause of action arising out of the employment relationship shall be governed by the laws of the State of Connecticut, without regard to its conflicts of laws principles." (Hearing Exh. 2, § 4.2).

In Section 3.1 of the Employment Agreement, Brown acknowledged that he "will have access to confidential information maintained [*10] at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers." (Hearing Exh. 2, § 3.1). Brown agreed that "[t]his information is proprietary to the Company and, if used by competitors or other third parties, could cause substantial and irreparable damage to the Company." (Id.).

In Section 3.1 of the Employment Agreement, Brown also agreed as follows:

> All equipment, notebooks, documents, memoranda, reports, computer programs, forms, files, books, correspondence, lists, or other written and graphic records or other information storage devices, and the like, including innovations, ideas and developments, affecting or relating to the business of the Company, which Employee shall prepare, use, construct, observe, possess, or control, shall be and remain the Company's sole property.

(Id.). In the event of termination, Brown agreed to "deliver promptly" to Roth Staffing all of the "equipment, notebooks, documents, memoranda, reports, files, samples, books, correspondence, lists, or other written or graphic records, and the like" relating to Roth Staffing's business, "which are or have been" in Brown's possession or under his control. (Id. [*11] § 3.2).

In Section 3.3 of the Employment Agreement, Brown agreed during the term of his employment, and for a period of one year thereafter,

he[ ] will not, directly or indirectly, own an interest in, operate, join, control, or participate in, or be connected as an officer, employee, agent, independent contractor, partner, shareholder, or principal of any corporation, partnership, proprietorship, firm, association, person, or other entity which directly or indirectly competes with the Company within [twenty-five] miles of any location of the Company at which the Employee worked or was assigned, other than as a passive stockholder in such corporations whose stock is traded on a recognized stock exchange.

(Id., § 3.3).

Section 3.6 of the Employment Agreement which, governs the solicitation of customers and prospective customer, reads:

> During the term of this Agreement and for a period of one year after the employment relationship between the parties terminates, Employee agrees that he[] will not, directly or indirectly or by action in concert with others, solicit, induce or influence (or seek to induce or influence) any customer or prospective customer of the Company for the purpose of promoting or selling any products [*12] or services competitive with those of the Company. This limitation only shall apply to customers and prospective customers known to the Employee or with whom the Employee had contacts or dealings during his[] employment.

(Id., § 3.6).

Section 4.3 of the Employment Agreement, entitled "Tolling and Severability[,]" reads:

> Employee agrees that the time provisions contained in Sections 3.3, 3.5 and 3.6 shall be tolled by the length of time during the period of which Employee is in breach of said provisions. Should any of this portion of this Agreement be

determined by any arbitrator or court of competent jurisdiction to be invalid, the remainder of the Agreement will remain in full force and given an effect as near as possible to the original intent of the parties. . . . [I]f any such restriction is found by an arbitrator or court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(Id., § 4.3).

During his latter employ with Roth Staffing, Brown worked in the Ultimate Staffing [*13] line of business as a Business Solutions Manager ["BSM"]. (Tr. at 4-5). In his role as a BSM, Brown was the primary contact for customers and job candidates. (Id. at 5-6). According to Brown, he would establish contacts by calling publicly available telephone numbers, through websites that list the human resources contacts, or by "walk[ing] through the front door[.]" (Id. at 12-13; see also id. at 71). Corey Miller, the Regional Vice President of Roth Staffing, explained that Roth Staffing encourages its customers to contact BSMs directly, and that it is important that Roth Staffing build rapport, trust and confidence with its customers as that will lead to long-term business. (Tr. at 105-07). Recurring business is particularly important because it is difficult to create new business relationships with potential customers. (Id. at 107-08). The relationship building process is something that takes time and something that BSMs are expected to do, and for which they are compensated. (Id. at 111).

Similarly, Brown testified that his customers' preferences, the methods they liked to use to communicate with their staffing providers, and the types of positions they needed to fill, were "learned over time." (Id. at 13-14). Customer information was then stored in Roth [*14] Staffing's software program called Staff Suite. (Id. at 15). The Staff Suite program details information regarding Roth Staffing's customers and job candidates, including notes from customer contacts, customers' purchasing histories, jobs filled, pay rates, bill rates, past relationships, overall utilization, and how and when each customer hires temporary or permanent employees. (Id. at 13-15). When working for Roth Staffing, defendant Brown was involved in setting Roth Staffing's bill rates, which information is not publicly available. (Id. at 14-15).[5] The Staff Suite program is password protected, and as defendant Brown acknowledged, this information is valuable to Roth Staffing's competitors, and Roth Staffing expends a substantial cost to maintain this program. (Id. at 15-17, 99,113). In addition to keeping this program password protected, Roth Staffing asks every employee to sign a noncompete as a means of protecting their confidential information (id. at 113), and Brown signed such a noncompete by virtue of signing his Employment Agreement. Miller explained that this "protected database[]" is "probably one of the most valuable parts of [Roth Staffing's] business." (Id. at 111; see also id. at 112).

5 Brown later testified that to learn bill rates, he "can call and [*15] ask the decision maker [and] [t]hey'll almost readily give it to you." (Id. at 72). But see note 10 infra.

## 2. STAFFING NOW INCORPORATED

After plaintiff left Roth Staffing at the end of September 2012, plaintiff worked for one week, from October 29 to November 2, 2012, at Staffing Now Incorporated ["SNI"], in Holyoke, Massachusetts; SNI is located approximately fifteen miles from Brown's home in East Longmeadow, Massachusetts. (Id. at 20-21). Since Holyoke is more than twenty-five miles from Hartford, it is not covered by the twenty-five-mile geographic restriction contained in Section 3.3 of the Agreement. (See Hearing Exh. 2, § 3.3; see Tr. at 118).

SNI hired Brown at a higher base salary ($75,000) than he earned at Roth Staffing ($65,000), and he was eligible for commissions on top of his salary from SNI. (Tr. at 21, 23). However, after one week of employment, Brown quit his job at SNI. (Id. at 21).

## 3. OEM PROSTAFFING

On November 7, 2012, five days after quitting SNI, Brown started working for defendant OEM ProStaffing, which is located at 330 Roberts Street in East Hartford, Connecticut, approximately three miles from Roth Staffing's Hartford Office. (Id. at 3, 21-22; Hearing Exh. 3). David Fernandez is the owner and president of OEM

ProStaffing, and [*16] he is also the owner and president of OEM America. (Id. at 25).[6] OEM ProStaffing had no employees or customers before it hired Brown in November 2012. (Id. at 24). OEM Prostaffing hired Brown at the same base salary that he earned at Roth Staffing, plus a twenty-five percent commission on "new business" he produces for OEM Prostaffing. (Id. at 22-24; Hearing Exh. 3). The twenty-five percent commission rate is higher than Brown's commission rate at SNI and much higher than the 3.5 percent commission rate at Roth Staffing. (Tr. at 24).[7]

6  OEM America is a professional employer organization ["PEO"]; staffing services is only a "portion of what they do." (Id. at 25). In fact, while Brown was employed by Roth Staffing, David Fernandez, in his role as president of OEM America, referred Lincoln Waste to Brown for staffing services, as OEM American did not offer such services. (Id. at 25-26).

During his hiatus from plaintiff, Brown worked for Fernandez at OEM America in 2009 and 2010 selling PEO services, or as Brown testified, he "[t]ried to[]" sell those services. (Id. at 61; see id. at 69-70 (Brown testified he did not sell any PEO services in the nine months that he was with that company); see note 10 infra). In 2009, plaintiff signed a noncompete agreement with OEM America [*17] that covered the entire State of Connecticut and Hampden County, Massachusetts, in which Holyoke is located. (Id. at 62-64; Hearing Exh. 11).

7  Brown testified that he has not received his twenty-five percent commission. (Id. at 79). He also testified that, "I think [twenty-five] percent had to be an absolute mistake as written in there. You couldn't do business giving someone a [twenty-five] percent commission. It would be astronomical. It would be two to three times the average commission." (Id. at 102). Just "a few weeks" prior to his deposition, and within three months of the preliminary injunction hearing, Brown started to receive some commissions. (Id. at 79).

## 4. CUSTOMERS

### a. CONNECTICUT SPRING AND STAMPING

While working at Roth Staffing, Brown developed

Connecticut Spring and Stamping ["Connecticut Spring"], located in Farmington, Connecticut, as a customer for Roth Staffing. (Id. at 35, 53; see Hearing Exh. 7). Brown explained that he had called the contact at Connecticut Spring "for years to get business[]" and he first met her when working for Roth Staffing. (Id. at 35-36). Over time, Brown generated business for Roth Staffing from Connecticut Spring, and increased Roth Staffing's share of such business, all while Roth Staffing was paying Brown's [*18] salary and commission. (Id. at 36-38). Eventually, the Connecticut Spring account became the biggest account that Brown handled for Roth Staffing. (Id. at 35).

At the time that Brown left Roth Staffing in September 2012, he was the only person in the Company who was dealing directly with the contact person at Connecticut Spring. (Id. at 42, 93). Brown knew the types of machinery that Connecticut Spring has, the types of machinists for which Connecticut Spring has an on-going need, and the types of candidates who have been successful at Connecticut Spring in the past. (Id. at 42-44). Brown's contact is not the hiring decision maker; she forwards the resumes on to the line manager who is someone Brown has never met. (Id. at 44-45). However, Brown's contact is the "gatekeeper" through whom Brown would have to get a candidate to a line manager. (Id. at 45). Much of the information that Brown has from his working relationship with his contact at Connecticut Spring is information in his memory because of his familiarity with the client's likes, dislikes, preferences and rate structure. (Id. at 45-46).

At the time that Brown was hired by OEM ProStaffing, OEM ProStaffing was not doing any work for Connecticut Spring, but just two months later, in January 2013, OEM ProStaffing [*19] was the staffing company that had the most temporary employees at Connecticut Spring. (Id. at 38-39; see id. at 41-42). During the month of May 2013, Brown was doing approximately $20,000 worth of business a week with Connecticut Spring, which translates to more than $1,000,000 of business per year. (Id. at 39-42; Hearing Exh. 7). Connecticut Spring similarly has become Brown's "biggest customer at OEM ProStaffing." (Tr. at 35).

Wendy Ward, Roth Staffing's Practice Manager, continues to make on-going efforts to sell staffing services to Connecticut Spring, as does her manager,

Theresa Del Vecchio, but without success. (Tr. at 148).

### b. LINCOLN WASTE

While Brown was employed by Roth Staffing, David Fernandez, in his role as president of OEM America, referred Lincoln Waste, located in Bloomfield, Connecticut to Brown for staffing services, as OEM America is a PEO. (Id. at 26, 49; see also Hearing Exh. 12).[8] Brown and Elaine Carpino, another BSM from Roth Staffing, met three members 8 ers of Lincoln Waste's management, after which Carpino provided administrative and clerical staffing services to Lincoln Waste on behalf of Roth Staffing. (Tr. at 26-28).

> 8 See note 6 supra.

Shortly after Brown was hired by OEM Prostaffing, on January 3, 2013, [*20] he made a sales call to Lincoln Waste with Lori DiVicino, a salesperson employed by OEM America, meeting with the same three executives again. (Id. at 28-29; Hearing Exh. 4). Brown testified that during this sales call, DiVicino advised them "something to the effect of, 'We have a staffing company now.'" (Tr. at 29). When Brown returned to his office after the meeting, he sent an e-mail to one of these executives, in which he stated that he "wanted to get back to you asap to get started on any openings you have." (Hearing Exh. 4; Tr. at 29-31). Brown also sent him an e-mail to "get started on the scanning opening" and offer a candidate for that opening. (Hearing Exh. 4). On or about January 8, 2013, Brown posted a customer service representative position at Lincoln Waste, which is the same type of position that Carpino would have filled for Roth Staffing. (Hearing Exh. 5; Tr. at 31-32).

In a subsequent e-mail dated January 23, 2013, sent to his contact at Lincoln Waste, Brown "apologize[d] for [his] stalker mentality[,]" and explained that "time kills all deals." (Hearing Exh. 6; Tr. at 32-33). Brown also testified that frequent communication with a customer and regular recruitment of new customers is important [*21] to increase the likelihood that a customer will choose OEM ProStaffing's candidate for the position. (Tr. at 33-34, 47-48).

At the time of the hearing, OEM Staffing had two placements at Lincoln Waste (id. at 73), and after Brown was hired by OEM ProStaffing, OEM ProStaffing received the exclusive opportunity to fill the roles of chief financial officer and general manager at Lincoln

Waste when those positions became available. (Id. at 34-35).

Roth Staffing's sales to Lincoln Waste have declined in the fourth quarter of 2012 and the first and second quarters of 2013. (Hearing Exh. 14; Tr. at 125-26). As Miller and Ward both testified, this decline in sales to Lincoln Waste has had a significant impact specifically on Carpino, a single mother who earns commissions on her sales of Roth Staffing's services to Lincoln Waste; as with Connecticut Spring, plaintiff has made continuing efforts to retain Lincoln Waste's business, again without success. (Tr. at 124-27, 149-51; Hearing Exhs. 12, 14).

### c. DRI-AIR AND AQUA BLASTING

Brown sold staffing services to Aqua Blasting, also located in Bloomfield, and Dri-Air, located in East Windsor, Connecticut, when he worked with Roth Staffing and continued to sell staffing [*22] services to them both after he started working at OEM Prostaffing. (Tr. at 49-50; see Hearing Exh. 14). Brown started working with Dri-Air in 2004, and continued selling to them while working for Roth Staffing, and continues to sell to them while working for OEM ProStaffing. (Id. at 50). Similarly, Brown sold services to Aqua Blasting while working for Roth Staffing and continued to do so while working for OEM ProStaffing. (Id. at 49-50).

### d. CANDIDATES AND PLACEMENTS

Brown has placed a number of job postings on behalf of OEM ProStaffing. (Id. at 31-32, 51-54; Hearing Exhs. 5, 9). Most of the positions Brown tries to fill are in the Greater Hartford area, and most of the job candidates he submits for these positions live in and around that area. (Tr. at 48-49). According to Brown, his "zone of influence" is fifteen or twenty miles outside of Hartford. (Id. at 49). However, like his sales and placement activities for Roth Staffing, Brown's activities for OEM ProStaffing extend beyond the immediate vicinity of Hartford and include areas outside of Hartford County, such as Western Massachusetts and Waterbury, Connecticut. (Id. at 53-54). As Brown explained, "I really don't have a sales territory. I mean, wherever I can get business and fill it." ( [*23] Id.).

### 5. DEFENDANTS' REFUSALS TO STOP BROWN'S COMPETITVE ACTIVITIES ON BEHALF OF OEM PROSTAFFING

After Brown started working at OEM ProStaffing, Miller contacted Brown and asked him if he was working in the Hartford area. (Id. at 56). Miller had learned from his coworkers that Brown was directly competing against Roth Staffing's Ultimate Staffing division that was responsible for clerical and manufacturing placements, and specifically, that Brown was selling to Connecticut Spring. (Id. at 119). Miller told Brown that he was concerned that his actions might impact his former co-workers' earnings, and their families. (Id. at 57). Brown described the phone call as an "awkward conversation[,]" and he "assumed from there" that Roth Staffing might take legal action against him if he violated the Employment Agreement. (Id.). Miller testified that Brown "assured [Miller] that everything that [Brown] was doing was in compliance with his noncompete and that we, as a company, and he, as a person, had nothing to worry about." (Id. at 120). Miller similarly agreed that Brown had told him that "[e]verything would be okay" and that Brown was "basically noncommital with him." (Id. at 56-57).

Soon thereafter, Brown received a letter from Roth Staffing's attorney, [*24] in which a copy of the Employment Agreement was enclosed; the letter reminded Brown of his legal obligations to Roth Staffing. (Id. at 58-59; Hearing Exh. 10). Instead of reading the letter, Brown gave it to his attorney and showed it to Fernandez, who said he received a copy of the same letter and told Brown, "We'll take care of it, don't worry about it." (Id. at 59-60). Fernandez and Brown never had any discussions about finding Brown a different job until his one-year noncompetition expired. (Id. at 61).

## C. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary and drastic remedy [that] is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90, 128 S. Ct. 2207, 171 L. Ed. 2d 1 (2008)(citations & internal quotations omitted). In each case, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter v. NRDC, Inc., 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)(citations & internal quotations omitted).

To succeed on a motion for preliminary injunction,

the moving party must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently [*25] serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the moving party requesting the preliminary relief." Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd, 598 F.3d 30, 35 (2d Cir. 2010)(multiple citations & internal quotations omitted); see MacDermid, Inc. v. Raymond Selle and Cookson Group PLC, 535 F. Supp. 2d 308, 315 (D. Conn. 2008)(citation omitted). The court "must consider whether irreparable injury is likely in the absence of an injunction, [the court] must balance the competing claims of injury, and [the court] must pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Salinger v. Colting, 607 F.3d 68, 79 (2d Cir. 2010)(citations & internal quotations omitted).

## 1. LIKELIHOOD OF SUCCESS ON THE MERITS

Roth Staffing need not show that success on the merits is "an absolute certainty." United Rentals v. Bastanzi, No. 3:05 CV 596 (RNC)(DFM), 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at 4, n.6 (D. Conn. Dec. 22, 2005)["Bastanzi"](citation & internal quotations omitted), approved in relevant part over objection, 2005 U.S. Dist. LEXIS 45268, 2006 WL 346317 (D. Conn. Feb. 8, 2006). Rather, it "need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." Id. (citation & internal quotations omitted). In its Complaint, in addition to its claim for a violation of CUTSA, plaintiff asserts claims for breach of contract, and tortious interference with contract. [*26] (Dkt. #1). Before the Court may reach the question of whether the Agreement has been breached, the Court must consider whether the Agreement is enforceable.

"[U]nder Connecticut law, post-employment covenants are valid if reasonable under the circumstances." MacDermid, 535 F. Supp. 2d at 316 (citation omitted); see also Scott v. General Iron & Welding Co., 171 Conn. 132, 137, 368 A.2d 111 (1976). The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection offered to the employer; (4) the extent of the restraint on the employee's

opportunity to pursue his occupation; and (5) the extent of the interference with the public's interests. MacDermid, 535 F. Supp. 2d at 316; Robert S. Weiss & Assocs., Inc. v. Wiederlight, 208 Conn. 525, 529, n.2, 546 A.2d 216 (1988)["Robert S. Weiss"]; Scott, 171 Conn. at 137; New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531, 533-34, 559 A.2d 715 (App. Ct.), certif. denied, 212 Conn. 809, 564 A.2d 1071 (1989). "The five prong test of Scott is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." New Haven Tobacco, 18 Conn. App. at 534 (citation omitted). The "party challenging the restrictive covenant has the burden of showing that it is unenforceable." Drummond American LLC v. Share Corp., No. 3:08 CV 1665(MRK), 2009 U.S. Dist. LEXIS 105965, 2009 WL 3838800, at *3 (D. Conn. Nov. 12, 2009), citing Scott, 171 Conn. at 139.

Covenants not to compete that include geographic and time restrictions are valid [*27] if they are reasonably limited and fairly protect the interests of both parties. See Scott, 171 Conn. at 140 (upholding five year covenant barring employee from working as a manager in a competing business); see also Robert S. Weiss, 208 Conn. at 530-31 (upholding two year restriction in restricted geographical area); Torrington Creamery, Inc. v. Davenport, 126 Conn. 515, 520, 12 A.2d 780 (1940)(upholding a two-year restriction applicable to specific and limited geographic area).

The noncompetition and anti-solicitation provisions in Sections 3.3 and 3.6 are both for a one-year period. (Hearing Exh. 2, §§ 3.3, 3.6). The one year period is tolled by the length of time that Brown has breached these provisions. (Id., § 4.3). Consistent with Connecticut precedent, this Court finds that the one-year period is a reasonably limited amount of time. See Robert S. Weiss, 208 Conn. at 530-31 (upholding two year restriction); Scott, 171 Conn. at 140 (upholding five year covenant); Torrington Creamery, 126 Conn. at 520 (upholding a two-year restriction); see also Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7 (defense counsel conceded that one-year restriction is reasonable).

Geographic restrictions are reasonable when they protect the areas in which a company does business. See Scott, 171 Conn. at 137-39; see Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7 (seventy-five mile radius captures the market serviced by plaintiff and is enforceable). The twenty-five mile restriction in

Section 3.3 is reasonably limited to the area in which Roth Staffing Hartford's office does business. [*28] According to Brown, his "zone of influence" is fifteen or twenty miles outside of Hartford (Tr. at 48-49), and as he explained, when he worked in Roth Staffing's Hartford office, Brown's sales and placement activities extended beyond the Hartford area and included Western Massachusetts and Waterbury, Connecticut. (Id. at 54).[9]

> 9  As Miller testified, in his eighteen years in the staffing industry, a twenty-five mile restriction is "[fifty] percent less than what most competitors would ask their potential employees to sign when entering into [an] employment agreement." (Id. at 115).

The anti-solicitation provision in Section 3.6 does not contain an express geographic restriction; it is limited to customers and prospective customers "known to [Brown] or with whom [Brown] had contacts or dealings during his[] employment. (Hearing Exh. 2, § 3.6). Such a customer-specific restriction is reasonable. See Robert S. Weiss, 208 Conn. at 531-32 (collecting cases)(barring solicitation of accounts that existed when employee left business is reasonable in view of the plaintiff's business situation).

The restrictive covenants in the Agreement are reasonably designed to afford a fair degree of protection to Roth Staffing. As Brown testified, he developed his customer [*29] relationships over a significant period of time, while being compensated by Roth Staffing. (Tr. at 37, 46, 86). Brown's investment of time in getting to known these customers gave him a distinct advantage in the market as he learned the identities of the individual contact persons at these customers, the pricing applicable to the customers, their buying cycles, the types of jobs they need to fill, the types of candidate they seek, and the customers' likes and dislikes. (Id. at 13-15). "Given the nature of the plaintiff's customer-driven business, it is reasonable for it to be concerned that an employee with extensive relationships with its customers, such as the plaintiff, might be in a position to threaten its business if the employee works for a competitor." Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7, citing Elizabeth Grady Face First, Inc. v. Escavich, 321 F. Supp. 2d 420, 425-27 (D. Conn. 2004)(concluding "twenty-five mile radius covers a range of territory reasonably necessary for the protection of Elizabeth Grady's goodwill and its investment in its customers). In

Bastanzi, the court held that a restrictive covenant that prohibited a salesperson from competing within seventy-five miles of the office where he had worked for the plaintiff was reasonable as such a restriction offered a fair degree of protection to the [*30] employer given the nature of the business. 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *6-7. Similarly, the twenty-five-mile radius in this case is reasonable and provides a fair degree of protection to Roth Staffing.

Defendant Brown contends that the Agreement unduly restricts Brown's ability to earn a living. (Dkt. #54, at 17). "By its very nature, the restrictive covenant affects the defendant's opportunity to pursue his occupation." Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7. However, this one does not do so unreasonably. See Scott, 171 Conn. at 138. As evidenced by Brown's ability to secure employment at SNI in Holyoke, Massachusetts, at a higher base salary than he was earning at Roth Staffing, as well as commissions, Brown is not deprived from the ability to earn a living. Since Holyoke is more than twenty-five miles from Hartford, it is not covered by the twenty-five-mile geographic restriction contained in Section 3.3 of the Agreement. (See Hearing Exh. 2, § 3.3; see Tr. at 118). Moreover, the twenty-five mile restriction is more limited than similar restrictive covenants common in the industry. As Miller testified, in his eighteen years in the staffing industry, a twenty-five mile restriction is "[fifty] percent less than what most competitors would ask their potential employees to sign when entering [*31] into [an] employment agreement." (Tr. at 115). Both Miller and Ward testified that while it took some time, they both transitioned successfully from other markets into their current geographic markets. (Id. at 117, 146-47). Rather than continuing to work at SNI for the one year period covered by the Employment Agreement, Brown left after one week and began competing with Roth Staffing at OEM ProStaffing's office, located less than three miles from Roth Staffing's Hartford Office. Brown has not established that the restrictive covenant unduly restricts his ability to earn a living. See United Rentals v. Frey, No. 3:10 CV 1628 (HBF), 2011 U.S. Dist. LEXIS 16375, 2011 WL 693013, at *7 (D. Conn. Feb. 18, 2011)["Frey"](restriction is reasonable when defendant "made no attempt to search for a job in a field or location that would not violate the Agreement."); Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7 (a covenant does not deprive the defendant the ability to earn a living when he is "permitted to work anywhere except in competition with the plaintiff within the restricted geographical area for a limited time period.").

Finally, there is no evidence that the enforcement of this covenant will harm the public interest. While Brown contends that "[a]ny attempt to chill competition by [Roth Staffing] through injunctive relief would eliminate a key [*32] member of the staffing market: OEM ProStaffing," and would eliminate Brown, "a key member of the staffing workforce[,]" (Dkt. #46, at 11), it is undisputed that Fernandez previously had operated a business, OEM America, which only entered the staffing industry in November 2012, when Brown was hired as the only employee of defendant OEM ProStaffing. (Tr. at 24).

Accordingly, having found that the Employment Agreement is enforceable, the Court now addresses plaintiff's likelihood of succeeding on its breach of contract claim, CUTSA claim, and tortious interference with contract claim.

### a. BREACH OF CONTRACT CLAIM

The elements of a breach of contract claim under Connecticut law are (1) formation of the agreement, (2) performance by one party, (3) breach by the other party and, (4) damages. United Rentals, Inc. v. Price, 473 F. Supp. 2d 342, 346 (D. Conn. 2007)(citation omitted). In light of the conclusion in Section I.C.1. supra, the Court finds that there is an enforceable Employment Agreement between the parties. As discussed above, it is undisputed that Brown signed his Employment Agreement in June 2010, and that his signature thereto was a condition of employment. Moreover, as discussed above, Roth Staffing has satisfied its burden of establishing the likelihood [*33] of success on its claims that Brown has been breaching Sections 3.3 and 3.6 of the Agreement, and in turn, is breaching the confidentiality provisions of Section 3.1.

### b. CONNECTICUT UNIFORM TRADE SECRETS ACT

The Court may award injunctive relief against both defendants under the CUTSA. Conn. Gen. Stat. § 35-52(a)("Actual or threatened misappropriation may be enjoined upon application to any court of competent jurisdiction."). Under Connecticut law, a protectable "trade secret" is broadly defined as

information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Conn. Gen. Stat. § 35-51(d). As discussed above, the Staff Suite program contains collected customer information that is inherently valuable to Roth Staffing, for which Roth Staffing seeks to keep confidential through password protection and by requiring its employees to sign noncompete [*34] agreements. Brown admitted under oath that he had access to Roth Staffing's "trade secrets and other confidential and proprietary information" during his employment with Roth Staffing. (Tr. at 11-12).[10] Additionally, Brown signed the Agreement in which he acknowledged that he "will have access to confidential information maintained at substantial cost by the Company regarding its temporary employees, regular employees, applicants, and prospective and actual customers." (Hearing Exh. 2, § 3.1). In light of the fact that Roth Staffing need not show that success on the merits is "an absolute certainty[,]" and that there "may remain considerable room for doubt[,]" Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at 4, n.6 (citation & internal quotations omitted), Roth Staffing has satisfied its burden of establishing a likelihood of prevailing on this claim.

10 Brown strenuously argues in his briefs that he does not possess any of Roth Staffing's confidential information; that the information was readily available; and that Brown's success at OEM ProStaffing is only due to the fact that he is an "aggressive, self-starter, self-trained staffing professional[.]" (Dkt. #54, at 13-14, 17-18; see Dkt. #46, at 7-8). Brown's credibility is questionable. On the [*35] resume that Brown submitted to Roth Staffing, Brown indicated that while working with OEM America, he "Closed

deals with total profit to company in excess of [$300,000]." (Hearing Exh. 13). However, at the hearing, Brown admitted that he lied on his resume to Roth Staffing, and that he did not make one deal while working for OEM America. (Tr. at 89-90). Additionally, Brown testified that he does not have a college education, an associate's degree, or any type of advanced education (Tr. at 80), yet, on his resume, Brown touts his attendance at "Holyoke Community College - Business-Management/Engineering 1984-1986". (Hearing Exh. 13). Similarly, in a job posting dated February 26, 2013, Brown wrote that OEM ProStaffing has "decades of experience" in recruiting and placing manufacturing and production workers with "the most respected clients in the Hartford market[.]" (Hearing Exh. 9). At the time that he wrote this, OEM Prostaffing had been providing staffing services through Brown for only three months. (Tr. at 52-53).

### c. TORTIOUS INTERFERENCE CLAIM

Under Connecticut law, the elements of a claim for tortious interference with contract are "1) the existence of a contract or a business [*36] relationship; 2) defendants' knowledge of that relationship; 3) defendants' intentional and tortious interference with that relationship; and 4) actual loss suffered by the plaintiff." Weber v. FujiFilm Med. Sys. USA, Inc., 933 F. Supp. 2d 285, 2013 WL 1149932, at *3 (D. Conn. 2013)(multiple citations omitted). "To succeed on a tortious interference claim," Roth Staffing must "prove at least some improper motive or improper means" used by OEM ProStaffing, resulting in a breach of Brown's Employment Agreement with Roth Staffing. Id. (citations omitted). Roth Staffing is likely to show that OEM ProStaffing was aware of the Employment Agreement, as Brown provided Fernandez a copy of the Agreement, and Miller called both Brown and Fernandez to remind them of Brown's obligations under the Employment Agreement. (Tr. at 59-61, 119-20). Additionally, Roth Staffing is likely to show that OEM Prostaffing intended to interfere, actually interfered, and continues to interfere with the Employment Agreement, causing Roth Staffing damages. Brown testified that when Fernandez received a letter from Roth Staffing's attorney along with the copy of the Employment Agreement, Fernandez told Brown, "We'll take care of it, don't worry about it." ( [*37] Id. at 59-60). Fernandez,

however, continues to employ Brown in a position in which he competes with Roth Staffing, and continues to reap the benefit of Brown's sales to his former Roth Staffing customers. Accordingly, Roth Staffing is likely to succeed on the merits of its claim for tortious interference with contract.

## 2. IRREPARABLE INJURY

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Bisnews AFE (Thailand) Ltd. v. Aspen Research Group, Ltd., 437 F. App'x 57, 58 (2d Cir. 2011)(citation & internal quotations omitted). Plaintiff must demonstrate that "absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. Id. (citations & internal quotations omitted)." A number of Connecticut courts and courts in this district have held that irreparable harm may be assumed in cases where the plaintiff alleges a breach of a restrictive covenant." Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *8, citing POP Radio, LP v. News America Marketing In-Store, Inc., 49 Conn. Supp. 566, 898 A.2d 863, 2005 WL 3112887, at *5 (Conn. Super. Ct. 2005); Sagarino v. SCI Conn. Funeral Servs., Inc., No. CV 000499737, 2000 Conn. Super. LEXIS 1384, 2000 WL 765260, at *2 (Conn. Super. Ct. May 22, 2000)("Irreparable injury and lack of an adequate remedy at law is considered to be automatically established where a party seeks to enforce a covenant [*38] not to compete."); Musto v. Opticare Eye Health Ctrs., Inc., No. 155663, 2000 Conn. Super. LEXIS 2298, 2000 WL 1337676, at *3 (Conn. Super. Ct. Aug. 9, 2000)(same); Century 21 Access Am. v. Lisboa, [35 Conn. L. Rptr. 272, 273, 2003 Conn. Super. LEXIS 2085, *5](Conn. Super. Ct. 2003)(finding that Connecticut courts typically find per se irreparable harm when a non-compete clause has been breached.); see also Frey, 2011 U.S. Dist. LEXIS 16375, 2011 WL 693013, at *9. "This is because when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." Frey, 2011 U.S. Dist. LEXIS 16375, 2011 WL 693013, at *9 (citation & internal quotations omitted).

Moreover, as recited above, in Section 3.3 of the Employment Agreement, Brown agreed during the term of his employment, and for a period of one year

thereafter, shall not compete with Roth Staffing within a twenty-five mile radius of the Company. (Hearing Exh. 2, § 3.3). Shortly after Brown was terminated from his employment with Roth Staffing on October 29, 2012, he went to work for SNI, located more than twenty-five miles from Hartford, but he stopped reporting to work at SNI after only one week of employment. (Tr. at 20-21). Brown acknowledged that Section 3.3 would not prohibit him from working for SNI. (Id. at 19).

On November 7, 2012, Brown began working for defendant OEM ProStaffing in East Hartford, located only three miles from Roth Staffing's Hartford office. (Tr. at 21-22; see Hearing Exh. 3). His work for OEM ProStaffing, a competitor [*39] of Roth Staffing, is in breach of Section 3.3. of the Agreement.

Additionally, as recited above, Section 3.6 of the Employment Agreement governs the solicitation of customers and prospective customers. (Hearing Exh. 2, § 3.6). Brown's actions of calling his contacts at Connecticut Spring and Lincoln Waste, Roth Staffing's customers, to inquire about openings for temporary workers, and offering to fill such positions, are in breach of the non-solicitation provision of Section 3.6 of the Agreement. (Tr. at 57-58). These breaches constitute irreparable harm.

As Brown testified, he had access to Roth Staffing's trade secrets[11] and confidential information stored in Roth Staffing's password protected Staff Suite program, and stored as information Brown retained in his memory, which he learned over his time with Roth Stafifng and which gives him an advantage in selling staffing services in competition with Roth Staffing. (Tr. at 11-12, 45-46). As Brown acknowledged, the Staff Suite program details information regarding Roth Staffing's customers and job candidates, including notes from customer contacts, customers' purchasing histories, jobs filled, pay rates, bill rates, past relationships, overall utilization, and how and when [*40] each customer hires temporary or permanent employees (Tr. at 14-15), and while working for Roth Staffing, defendant Brown was involved in setting Roth Staffing's bill rates, which information is not publicly available. (Id.).

11 See Section I.C.2.b. supra.

Brown also elaborated on his dealings with Connecticut Spring and Lincoln Waste, in direct competition with Roth Staffing. At the time that Brown

left Roth Staffing in September 2012, he was the only person in the Company who was dealing directly with the contact person at Connecticut Spring, and as Brown acknowledged, he knew the types of machinery that Connecticut Spring has, the types of machinists that Connecticut Spring has an on-going need for, and the types of candidates who have been successful at Connecticut Spring in the past. (Id. at 42-46, 93-94). This customer information gives him a distinct advantage in selling staffing services, and this information has been used to the benefit of Roth Staffing's competitor. Brown also testified that his "stalker mentality" towards Lincoln Waste, and his frequent communication with customers and regular recruitment of new customers is important to increase the likelihood that a customer will choose OEM Prostaffing's [*41] candidate for the position. (Id. at 33-34, 47-48). Brown has placed a number of job postings on behalf of OEM Prostaffing (Id. at 31-32, 51; Hearing Exhs. 5, 9), most of which are in the Greater Hartford area. (Tr. at 48-49; see also Hearing Exh. 8).[12]

> 12 Brown also testified that when he worked for Balance Staffing, a staffing company named Volt, and Scintillo Consulting, after working for Roth Staffing in 2006-07, Roth Staffing did not try to enforce its noncompete agreement. (Tr. at 66). Defendants contend that the "lack of irreparable harm is also evident in the fact that [Roth Staffing] did not attempt to enforce an earlier non-compete agreement[.]" (Dkt. #54, at 13, ¶ 7).

Roth Staffing's actions, or lack thereof, relating to previous noncompete agreements is irrelevant to the pending action as the 2010 Agreement states that it is "the entire agreement and understanding between the parties" and "supersedes all other agreements" between the parties with respect to the same subject matter of the Agreement. (Hearing Exh. 2, § 4.6). Additionally, the Agreement also provides, "[e]ither party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as waiver of any such provision or provisions, [*42] or prevent that party thereafter from enforcing each and every other provision of this Agreement." (Id., § 4.4). Moreover, as plaintiff accurately observes, there was no evidence offered that Brown violated his previous employment when he left the Roth Staffing in 2007, or that, if he did, the Roth Staffing was

aware of such a violation. (Dkt. #48, at 23, n.4).

In addition, Brown acknowledged that if Roth Staffing's confidential information is used by competitors or other third parties, it "could cause substantial and irreparable damage to [Roth Staffing]." (Hearing Exh. 2, § 3.1). Brown is soliciting and marketing Roth Staffing's customers. Brown's signature on the Agreement is an "acknowledgment, if not an admission, [or] at least evidence and a recognition of the reality that money damages are not sufficient to remedy the loss." Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *8 (citation omitted). Considering all of the foregoing, Roth Staffing has established sufficient evidence of irreparable harm to justify the issuance of an injunction.

Having found that plaintiff has demonstrated a likelihood of success on the merits and irreparable harm, plaintiff should be granted a preliminary injunction. However, the following two issues remain for [*43] additional briefing:

(1) As previously indicated, Section 4.3 of the Employment Agreement provides that "[e]mployee agrees that the time provisions contained in Sections 3.3, 3.5 and 3.6 shall be tolled by the length of time during the period in which [e]mployee is in breach of said provisions." Should this one year period commence on June 26, 2013, when the Court granted the parties' Joint Motion for Stipulated Order (Dkts. ##30, 34) or should it commence on the date of this Recommended Ruling? See Frey, 2011 U.S. Dist. LEXIS 16375, 2011 WL 693013, at *10 (injunction runs from one year of Recommended Ruling); Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *9 (same).

(2) Fed. R. Civ. P. 65(c) provides: "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." While this issue is seldom discussed in the many decisions in this district where preliminary injunctions have been granted in these contexts, or addressed merely in passing, see, e.g., Frey, 2011 U.S. Dist. LEXIS 16375, 2011 WL 693013, at *11 (no bond required, as set forth under language of the employment agreement); Bastanzi, 2005 U.S. Dist. LEXIS 45268, 2006 WL 346317, at *1 (remanding matter back to U.S. Magistrate Judge to determine appropriate amount of bond),[13] the question of bond has been discussed in

considerable detail [*44] in decisions issued by all four federal district courts in New York in this precise context. See, e.g., Leibowitz v. Aternity, Inc., No. 10 CV 2289 (ADS), 2010 U.S. Dist. LEXIS 70844, 2010 WL 2803979, at *25-26 (E.D.N.Y. July 14, 2010); Juergensen Def. Corp. v. Carleton Techs., Inc., No. 08-CV-959A, 2010 U.S. Dist. LEXIS 65540, 2010 WL 2671339, at *14-15 (W.D.N.Y. June 21, 2010); Mercator Risk Servs., Inc. v. Girden, No. 08 Civ. 10795 (BSJ), 2009 U.S. Dist. LEXIS 17879, 2009 WL 466150, at *9 (S.D.N.Y. Feb. 23, 2009); Payment Alliance Int'l, Inc. v. Ferreira, 530 F. Supp. 2d 477, 485 (S.D.N.Y. 2007); Innoviant Pharm., Inc. v. Morganstern, 390 F. Supp. 2d 179, 195-96 (N.D.N.Y. 2005); Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 541-42 (S.D.N.Y. 2004).

      13 As a result, it is no surprise that this issue was not raised in any of the parties' multiple briefs.

Thus, should plaintiff be required to post a bond under the circumstances of this case, and if so, in what amount?

Supplemental briefs on both issues are due **on or before November 8, 2013**, and briefs in response shall be filed **on or before November 22, 2013.**[14]

      14 Either any counsel believes that a settlement

conference before this Magistrate Judge would be productive, he should contact Chambers accordingly.

## III. CONCLUSION

For the reasons stated above, plaintiff's Motion for Preliminary Injunction (Dkt. #3) is granted.

The parties are free to seek the district judge's review of this recommended ruling. *See* 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; Fed. R. Civ. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further [*45] appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 16th day of October, 2013.

/s/ Joan G. Margolis, USMJ

Joan Glazer Margolis

U.S. Magistrate Judge

LEXSEE

**ROTH STAFFING COMPANIES, L.P., Plaintiff, v. THOMAS BROWN, et al., Defendants.**

Civil No. 3:13cv216 (JBA)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

**2015 U.S. Dist. LEXIS 61823**

**May 12, 2015, Decided**
**May 12, 2015, Filed**

**PRIOR HISTORY:** Roth Staffing Cos., L.P. v. Brown, 2013 U.S. Dist. LEXIS 189650 (D. Conn., Oct. 16, 2013)

**COUNSEL:** [*1] For Roth Staffing Companies, L.P., Plaintiff: Stephen P. Rosenberg, LEAD ATTORNEY, Littler Mendelson, P.C.- NH, CT, New Haven, CT.

For Thomas Brown, OEM Prostaffing, Inc., Defendants: Vincent Provenzano, LEAD ATTORNEY, Mancini, Provenzano, & Futtner LLC, Southington, CT.

For OEM of CT Inc, doing business as OEM America, Defendant: Christopher L. Brigham, LEAD ATTORNEY, Jesse Aaron Langer, Updike, Kelly & Spellacy, P.C.-NH, New Haven, CT; David R. Makarewicz, LEAD ATTORNEY, Updike, Kelly & Spellacy, PC-Htfd, Hartford, CT.

**JUDGES:** Janet Bond Arterton, United States District Judge.

**OPINION BY:** Janet Bond Arterton

**OPINION**

**ORDER OF CLARIFICATION REGARDING RECOMMENDED RULING**

This Order supplements and clarifies the Court's Order [Doc. # 93] approving and adopting the Second Supplemental Recommended Ruling and stating that the two prior Recommended Rulings were "deemed moot." However, the Court has not previously addressed Defendants' Objection [Doc. # 57] to the Recommended

Ruling [Doc. # 56] that recommended that the Court grant Plaintiff's Motion [Doc. # 3] for a Preliminary Injunction. For the reasons that follow, Defendants' Objection is overruled and Plaintiff's Motion is granted.

**I. Background**

Plaintiff's Motion for a [*2] Preliminary Injunction [Doc. # 3] sought to enjoin Defendants (1) from divulging Plaintiff's confidential business information; (2) participating in any venture that competed with Plaintiff within 25 miles of any of its locations; (3) soliciting any of Plaintiff's customers with whom Defendant Brown had contact while employed by Plaintiff; (4) soliciting any of Plaintiff's employees; and (5) to return to Roth Staffing any of its confidential information in their possession. The parties entered into a Stipulated Order [Doc. # 30] approved [Doc. # 34] by Magistrate Judge Margolis in which they jointly consented to all but Plaintiff's second and fifth requests in the Preliminary Injunction.

On October 16, 2013, after conducting an evidentiary hearing, Magistrate Judge Margolis issued a Recommended Ruling [Doc. # 56] recommending that the Court grant Plaintiff's Motion for a Preliminary Injunction and enjoin Defendant Brown to comply with the one-year noncompetition provision in his employment contract with Plaintiff and to return to Plaintiff its confidential business information. Magistrate Judge Margolis requested supplemental briefing on (1) whether this one-year period should commence [*3] on June 26, 2013, when she granted the Joint Motion for a Stipulated Order, or on the date of the Recommended Ruling, October 16, 2013[1] and (2) on how much bond

Plaintiff should be required to post. (Recommended Ruling at 27.)

1 The employment contract provided for tolling of the one-year limitation period while Defendant Brown was noncompliant.

On October 30, 2013, Defendants objected [Doc. # 57] to the Recommended Ruling, only insofar as it enjoined Defendants to comply with the noncompetition provision. On November 14, 2013, Plaintiff filed [Doc. # 65] an opposition to Defendants' Objection. On November 8, 2013, Plaintiff filed [Doc. # 60] a Supplemental Brief, addressing the issue of when the Preliminary Injunction should commence and the issue of bond. Defendants did not file a supplemental brief, and on December 19, 2013, Magistrate Judge Margolis issued [Doc. # 71] a Supplemental Recommended Ruling, setting the commencement of the Preliminary Injunction at the date of the Recommended Ruling absent objection and holding the question of bond in abeyance pending the parties' settlement discussions. On February 25, 2014, Magistrate Judge Margolis issued [Doc. # 86] a Second Supplemental Recommended Ruling, [*4] noting that settlement talks were not fruitful and setting bond at $75,000.

On March 14, 2014, this Court issued an Order [Doc. # 93] approving and adopting the Second Supplemental Recommended Ruling absent objection and concluding that the two prior Recommended Rulings were "moot."

## II. Discussion

Given that the Second Supplemental Recommended Ruling did not supersede the original Recommended Ruling, this Court erred in "deem[ing] moot" the original Recommended Ruling and implementing the Preliminary Injunction without addressing Defendants' objections.[2] It will do so now.[3] First, although Defendants' objection was not moot at the time of the Court's original Order, it has since become moot. The objected to portion of the Recommended Ruling enforced a one-year noncompetition provision that commenced on October 16, 2013 and thus this portion of the Preliminary Injunction dissolved by its own terms on October 16, 2014.[4]

2 Defendants did not move for reconsideration or otherwise object to the Court's oversight.

3 While generally a magistrate judge can hear

and determine any pretrial matter that is not dispositive of a party's claims or defenses, see Fed. R. Civ. P. 72(a), a motion for injunctive relief is considered dispositive [*5] and thus the Court reviews de novo those portions of the Recommended Ruling to which objection is made, 28 U.S.C. § 636(b)(1)(B)--(C); see also Mitchell v. Century 21 Rustic Realty, 233 F. Supp. 2d 418, 430 (E.D.N.Y. 2002) ("Motions for preliminary injunctions are dispositive matters."); Fed. R. Civ. P. 72(b)(3).

4 The portion of the Preliminary Injunction ordering the return of Plaintiff's confidential business information is not moot. Defendants did not object to this portion of the Recommended Ruling, although they denied that they were in possession of any such information. The Court approves and adopts this portion of the Recommended Ruling absent objection.

Second, Defendants' objection to the Recommended Ruling is without merit. Defendants contended that the Recommended Ruling (1) failed to recognize that the 25-mile geographical and one-year temporal limitations would have an "extreme detrimental effect" on Defendant Brown; (2) was "unfairly skewed in favor of" Roth; (3) incorrectly stated that enforcement of the noncompetition provision would be in the public interest; (4) and incorrectly found irreparable harm. (Defs.' Obj. at 2-6.) Defendants do not cite any authority in support of their first three arguments regarding the enforceability of the non-competition agreement, and as Magistrate Judge Margolis [*6] noted, "under Connecticut law, post-employment covenants are valid if reasonable under the circumstances." MacDermid, Inc. v. Raymond Selle & Cookson Grp. PLC, 535 F. Supp. 2d 308, 316 (D. Conn. 2008).

The five factors to be considered in evaluating the reasonableness of a restrictive covenant are: (1) the length of time the restriction operates; (2) the geographical area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests. Robert S. Weiss & Associates, Inc. v. Wiederlight, 208 Conn. 525, 529 n.2, 546 A.2d 216 (1988). Both the one-year and 25-mile limitations in the restrictive covenant are well within the realm of reasonable to protect Roth Staffing's business interests in

the Hartford area and greater restrictions have been upheld by Connecticut courts. *Id.* at 531 ("[T]he two year limitation fairly protected the plaintiff's interests in the commercial insurance business in the Stamford area while ensuring that Wiederlight could return to commercial insurance in that area within a definite period of time."); *Scott v. Gen. Iron & Welding Co.*, 171 Conn. 132, 140, 368 A.2d 111 (1976) ("[A] five-year restriction is reasonable."); *United Rentals, Inc. v. Bastanzi*, No. 3:05CV596 (RNC) (DFM), 2005 U.S. Dist. LEXIS 45268, 2005 WL 5543590, at *7 (D. Conn. Dec. 22, 2005) ("The restricted area--a 75 mile radius of the Gainesville, Florida branch--accurately captures the market serviced [*7] by the plaintiff and thus is precisely drawn to protect its goodwill. An employer can protect its business in the area where it does business.").

Defendants next contend that enforcement of the restrictive covenant will harm the public interest because several of Defendant Brown's clients "have expressed a desire to either continue working with him or to bring their business to the defendant OEM Prostaffing." (Defs' Obj. at 4.) However, in considering this factor, "the determinant is not whether the public's freedom to trade has been restricted in *any* sense, but rather whether that freedom has been restricted unreasonably." *New Haven Tobacco Co. v. Perrelli*, 11 Conn. App. 636, 639, 528 A.2d 865 (1987). By enforcing restrictive covenants, the Connecticut Supreme Court has recognized that "the public does not have an inherent right to do business with whomever it chooses when the individual of its choice has contracted away its ability to do business with the public." *Id.* at 640 n.3. The public's interest in a completely unrestricted marketplace does not mandate the non-enforcement of a restrictive covenant intended to safeguard an employer's business interest where "the employment involves the employee's contacts and associations with clients or customers" because "it is appropriate to [*8] restrain the use, when the service is ended, of the knowledge and acquaintance, so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge." *Robert S. Weiss & Associates, Inc.*, 208 Conn. at 533 (internal alterations and quotation marks omitted).

Finally, Defendants contend that even if the restrictive covenant were enforceable, the Recommended Ruling erred in presuming irreparable harm would result from Defendant Brown's noncompliance such that a preliminary injunction should issue. (Defs.' Obj. at 6.) While the Recommended Ruling noted that a number of Connecticut courts have held that irreparable harm may be assumed where a party breaches a restrictive covenant (Recommended Ruling at 23), the Recommended Ruling did not assume irreparable harm but rather engaged in an extensive discussion of the ways in which Defendants' non-compliance would cause irreparable harm by allowing them to use Plaintiff's confidential business information to poach clients (*id.* at 23-27).

Notwithstanding, Defendants' contention that irreparable harm should not be assumed, it cites no evidence or authority to suggest that irreparable harm would not result from noncompliance with the restrictive covenant here. To the contrary, the record evidence shows [*9] that Defendant Brown solicited clients from his former employer and "the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004); *see also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.").

### III. Conclusion

For the foregoing reasons, Defendants' Objection [Doc. # 57] to the Recommended Ruling [Doc. # 56] is OVERRULED and Plaintiff's Motion [Doc. # 3] for a Preliminary Injunction is GRANTED *nunc pro tunc*.

IT IS SO ORDERED.

/s/ Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 12th day of May, 2015.